Kathryn **JENNINGS, Individually and as Executrix of the Estate of Cecil Escher Jennings, Deceased, Betty Jennings, Individually and as Executrix of the Estate of Clinton E. Jennings, Deceased, John Robert Jennings, Terry L. Jennings, Scott E. Jennings, and Becky J. Jennings, a minor, by and through her mother and natural guardian, Betty Jennings, Plaintiffs-Appellees and Cross-Appellants,**

v.

**GENERAL MEDICAL CORPORATION, Defendant-Appellant and Cross-Appellee.**

Nos. 77–1205, 77–1206.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 25, 1978.

Decided Aug. 16, 1979.

Rehearing Denied Oct. 1, 1979.

---

H. E. Jones, Wichita, Kan. (Greer Gsell, Wichita, Kan., with him on the brief), of Hershberger, Patterson, Jones & Roth, Wichita, Kan., for plaintiffs-appellees and cross-appellants.

Robert L. Howard, Wichita, Kan. (Gerald Sawatzky, Wichita, Kan., with him on the brief), of Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for defendant-appellant and cross-appellee.

Before McKAY, LEWIS and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This is an appeal from an award of damages and prejudgment interest to plaintiffs against defendant General Medical Corporation (GMC), in an action arising out of a stock-for-stock exchange contract in which GMC acquired companies owned by plaintiffs. Jurisdiction is based upon diversity of citizenship. (Federal securities act claims were dropped before trial.) The plaintiffs are Kathryn Jennings, wife of Cecil Jennings, deceased, individually and as executrix of his estate; their son John Jennings; Betty Jennings, individually and as executrix of the estate of Clinton Jennings, another son of Kathryn and Cecil Jennings; Terry Jennings, Scott Jennings and Becky Jennings, children of Betty and Clinton Jennings (hereafter collectively the Jennings). The case was tried to the judge. On the basis of a finding of breach of contract by GMC the Jennings received judgment for $202,300 plus 6% interest from November 28, 1972 (less $3,850 in dividends received), on the condition they tender to GMC 5,000 shares of its common stock they acquired.

GMC has appealed on the issues of breach of contract, the measure of damages, and award of prejudgment interest. The Jennings have cross-appealed on the award of damages.

The issues on appeal all stem from a reorganization agreement executed on August 26, 1971, and a supplemental agree-

ment[1] (collectively, the Agreement) executed on September 23, 1971, under which the Jennings exchanged all outstanding shares of their family-owned Mid-West Surgical Supply Co., Wichita, Kansas, and Mid-West Surgical Supply Co. of Oklahoma, Oklahoma City, Oklahoma, (Mid-West) for common stock of GMC. The Jennings alleged that failure by GMC to give them written notice and an opportunity to join in a November 1972 registration of stock with the Securities Exchange Commission utilizing Form S–16 constituted a breach of the Agreement.

At the time of his death on May 9, 1971, Cecil Jennings, his wife Kathryn, and two children, John and Clinton Jennings, owned 100% of the Mid-West stock. With her husband's death, Mrs. Jennings came to rely on G. Ray Carnahan, her brother-in-law, for financial advice and assistance in the operation of Mid-West. At the outset, Carnahan acted gratuitously as a favor to the family, and received no compensation or reimbursement for his time and expenses.[2]

During the summer of 1971, Mid-West began experiencing cash flow problems. Carnahan investigated various financing arrangements to stabilize the company's financial position. When these efforts proved fruitless, he contacted Donald Alldritt, a securities broker in Wichita, with the intention of obtaining a buyer for Mid-West. On August 4, 1971, Carnahan obtained permission from Kathryn Jennings to allow Mid-West accountants to show the corporate financial records to three interested buyers. On August 11, 1971, GMC, as a potential buyer, executed a letter of intent to enter into a plan for reorganization with the Mid-West shareholders.

During negotiations, a major stumbling block was the type of stock to be received by the Jennings family in exchange for their Mid-West shares. Due to a large federal estate tax liability and other expenses, Mrs. Jennings was eager to obtain liquidity in her husband's estate. The initial draft of the exchange agreement, written by GMC attorneys, specified the stock was to be unregistered restricted or "legend" stock. Such stock could not be sold without a registration, except under circumstances such as death of the stockholder, prior to two years after the exchange, under what later became SEC Rule 144. 17 C.F.R. § 230.144.[3] That draft contained the tagalong registration provision, later adopted with one minor change, which is the focal point of the appeal. The provision permitted the Jennings to participate in certain SEC registrations of GMC shares if a public offering was made within three years of the date of the Agreement.

Throughout the contract negotiations the Jennings were represented by Carnahan, attorney Lawrence Curfman, Alldritt and certified public accountants Alvin Marcus and Marvin Kaufman. No Jennings took a personal active role in the negotiations. On behalf of the Jennings attorney Curfman first took the position restricted stock was unacceptable. But in the only face-to-face negotiating session between the representatives the restricted stock provisions were left in the contract and the tagalong provi-

---

1. When the Agreement was executed, Clinton Jennings was legally incapacitated and unable to participate in the reorganization. The Supplement was signed after he was legally restored to capacity, and is by its terms incorporated into the Agreement and includes Clinton Jennings' 980 Mid-West shares in the reorganization.

2. The Jennings later agreed that Carnahan would receive 1,277 shares of GMC as compensation; a written agreement to that effect was executed on November 3, 1971.

3. On January 11, 1972, Rule 144 was promulgated by the SEC. Sec. Act Rel. No. 5223 [1971–'72 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 78,487. Rule 144 governs resale of restricted securities, and resale of certain unrestricted securities. The rule outlines objective means of determining when resale will be permitted, one of which is a two-year holding period. At the time the Agreement was signed, resale of restricted securities depended on more subjective criteria outlined in existing case law. See S. E. C. v. Ralston Purina, 347 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). The tagalong privileges would permit the Jennings family to register their shares and thus resell without regard to Rule 144 and the holding period.

sion became ¶ 11 of the agreement. The only language change lengthened from 20 to 25 days the period the Jennings had to respond to notice of an offering opportunity. To induce the Jennings to accept the restricted stock, GMC arranged for the Bank of Virginia to commit to extend a $125,000 loan, secured by a pledge of GMC stock of twice that value. GMC agreed to a buy back of the stock from the bank in the event of default. Because Mrs. Jennings was able to arrange with the Internal Revenue Service for a 10-year installment payment of the federal estate taxes she did not exercise the loan option.

The trial court also found, with respect to the "tagalong" rights, that agents of GMC "represented that a registration would occur in the near future, although no definite promise was made as to a specific time period . . . [and] that plaintiffs would have the opportunity of joining in the next registration." Curfman was given a GMC prospectus involving a July 14, 1971 registration under SEC Form S–1, involving both a "primary" offering of shares on behalf of the company and a "secondary" offering of restricted stock on behalf of some stockholders.[4]

The court also found that neither the GMC nor Jennings' attorneys were familiar with Registration Form S–16 at the time of the Agreement. There was no discussion about an S–16 offering in particular, or whether the ¶ 11 tagalong privileges applied to only primary or secondary offerings by GMC. Although the Jennings believed they would be allowed to exercise their ¶ 11 tagalong privileges in the near future, the trial court found no active fraud or misrepresentation.

The terms of the Agreement provided for a tax-free stock-for-stock exchange pursuant to § 368(a)(1)(B) of the Internal Revenue Code of 1954. The Jennings family received GMC stock according to a formula

based upon market value of GMC stock ($29⅛ per share) equal to 125% of the book value of Mid-West on August 31, 1971. GMC, whose shares are now listed on the New York Stock Exchange, acquired a number of other companies, both before and after the Mid-West Agreement, in similar stock-for-stock exchanges.

On November 28, 1972, GMC registered 132,541 shares pursuant to Form S–16 for a secondary offering of its common stock on behalf of stockholders. The registration occurred because certain selling shareholders possessed S–16 demand privileges under specific language in exchange agreements negotiated during 1972, by which they could force GMC to register shares under Form S–16. All shares in this offering were sold by December 5, 1972, at a net to each selling shareholder of $40.46 per share. The shares registered and sold were owned by various GMC shareholders, officers, directors, employees and their families. Some, but not all, of these shareholders had tagalong privileges similar to those given to the Jennings family in ¶ 11. GMC contends it was voluntarily allowing these holders of restricted securities who did not have S–16 demand privileges to join in the registration. Other shareholders with rights similar to the Jennings were not told of the upcoming S–16 offering.

None of the Jennings received written or any other notice of the S–16 offering. The court found that Max Goodloe, Chairman of GMC, contacted Carnahan about the offering, and that Carnahan told Goodloe the Jennings family should not be notified of the offering since they would waste any proceeds from sale of their stock. GMC made no further efforts to contact the Jennings, under the apparent assumption it had no binding obligation to do so, and that Carnahan (with whom it had dealt directly throughout the negotiations) was acting on

**4.** The basic difference between primary and secondary offerings of securities is that in primary offerings the issuing corporation is offering its own stock and will itself receive the proceeds of the sales. In secondary offerings shareholders of the corporation are selling

stock which they own in the corporation and will take the proceeds. In both types of offerings the corporation is the registrant, because of the financial information and representations required by SEC rules.

their behalf. The court held Carnahan had no authority or power to act for the Jennings, and this finding has not been appealed.

The market price of GMC stock increased considerably over the 29⅛ exchange price for a while, reaching a high of 49½ in September 1972. After the S–16 offering it began a steady decline. At the time suit was filed in August 1974, the market price per share ranged from 5⅛ to 7⅞.

In January, 1974, Carnahan contacted an officer of GMC requesting he explain to Kathryn Jennings about removal of the legend from the GMC stock certificates. Norman Scher, attorney for GMC, contacted Mrs. Jennings by telephone. The conversation concerned the complications using the restricted shares as loan collateral. When Mrs. Jennings asked whether there had yet been a public offering of GMC stock, Scher indicated there had been one in December, 1972. Although Scher expressed surprise initially that the Jennings had not been notified of the S–16 offering and given an opportunity to join, he explained to her that an S–16 offering did not specifically apply to her contract rights, and that the Agreement therefore did not obligate GMC to notify her of the S–16 registration.

Kathryn Jennings then contacted both Carnahan and her lawyer, Curfman. After a meeting between attorneys for both sides failed to resolve the controversy surrounding the S–16 registration, this lawsuit ensued.

■ We do not address the findings and issues as to the number of shares the Jennings might have sold, nor the prejudgment interest question, because we hold that judgment in favor of GMC is required on the breach of contract issue.

The key question in this case is whether GMC breached the Agreement, in failing to notify the Jennings of an impending registration under S–16, and giving them an opportunity to participate. The relevant portion of the Agreement, ¶ 11, reads as follows:

If a Buyer at any time within three years after the Closing Date proposes to file a registration statement under the Securities Act of 1933, as amended, (the "Act"), with the Securities and Exchange Commission, on *Form S–1, S–7 or any successors to such forms*, covering a public offering of common stock of Buyer [GMC], Buyer shall, at least 30 days prior to such filing, give written notice of such proposed registration to each Stockholder [the Jennings] at the address appearing on the books of the transfer agent for Buyer's Stock [GMC stock exchanged for Mid-West stock] provided such Stockholder is then the holder of Buyer's Stock. Upon the written request of one or more of the Stockholders, covering an aggregate amount of at least 5,000 shares of Buyer's Stock, given within 25 days after receipt of any such notice and containing an agreement to sell such stock using the same underwriters and at the same time and price and under the same conditions as the Buyer under appropriate custody agreements and powers of attorney, Buyer will, subject to the provisions of (i) and (ii) below, use its best efforts to cause all such stock to be registered under the Act and sold in such public offering; provided, however, that (i) the Stockholder shall pay all underwriters discounts or commissions relating to the Buyer's Stock so sold by the Stockholder and make satisfactory arrangements with Buyer for the payment of the Securities and Exchange Commission registration fee, state "blue-sky" fees and expenses, the National Association of Securities Dealers filing fee, applicable transfer taxes, and the premium of any indemnity insurance policy paid by Buyer in connection with such registration and relating to the Buyer's Stock so sold by the Stockholder, and (ii) if the Buyer's Stock requested to be registered by the Stockholders under this paragraph together with the total number of shares of common stock of the Buyer requested to be registered by other stockholders of Buyer having registration rights comparable to those of the Stockholders hereunder (the "Tag Along

Amount"), exceeds 50 per cent of the total number of shares of common stock of the Buyer to be included in such registration statement (the "Maximum"), Buyer may reduce the Tag Along Amount, on a pro rata basis among such stockholders to 50 per cent of the Maximum. In the event any Stockholder does participate in such a registration and sale, the Stockholder and Buyer will exchange reciprocal indemnity agreements covering liability for any misrepresentations in the registration statement based on information supplied by the other party. (Emphasis added.)

Form S–1 became effective on October 25, 1955, and is the basic form for securities registration under the Securities Act of 1933. It is used for registering securities "of all issuers for which no other form is authorized." 17 C.F.R. § 239.11 (1976). Registration pursuant to S–1 is generally for primary offerings of securities. (Form S–1, Item 3). It may be used for secondary offerings, however, and, as was the case in the July 14, 1971 GMC offering whose prospectus was shown to Curfman, a primary and secondary offering may be combined using that form.

Form S–7, which became effective on December 31, 1967, is used in a narrower class of offerings made for cash, "by or on behalf of the registrant[5] or any other person." 17 C.F.R. § 239.26 (1978). Availability of S–7 depends largely on whether the corporation has other required information already on file with the SEC by virtue of having a class of equity securities already registered under either §§ 12(b) or 12(g) of the Securities Exchange Act of 1934. For this reason, it is commonly referred to as a short form of registration used by "seasoned corporations." *See* Bloomenthal & Wing, Securities Law, 7–14 (1973). So, S–7 cannot be as widely used as S–1.

Form S–16 became effective January 21, 1971, a few months before the Agreement at issue here. Hence it was an existing form when that Agreement was executed. Its use was not available to GMC at the time, however, since its stock was not yet listed upon the New York Stock Exchange and there were severe restrictions imposed upon S–16's use. Certain amendments were adopted June 27, 1972, which made this a much more useful and popular form. Except for registrations of offers to holders of an affiliate's convertible securities and securities to be issued on exercise of outstanding publicly-held warrants, S–16 is strictly limited to secondary offerings, and may be utilized by those corporations that could also register under Form S–7. 17 C.F.R. § 239.27 (1978); *see also*, Bloomenthal & Wing, *supra* at 7–16. Like S–7, Form S–16 depends for its use on certain specified information being already on file with the SEC.

Most of the argument here focused on whether S–16 could be regarded as "successor" to Forms S–1 and/or S–7. Form S–16 itself states it may be used for registration of certain securities of an issuer which "meets the requirements for the use of Form S–7." Apparently because of that, the fact Form S–16 became available to GMC when its stock was listed on the New York Stock Exchange, and major amendments expanding its use were made in 1972, the court found it was a successor to Forms S–1 and S–7 within the meaning of ¶ 11 of the Agreement.

As noted above, the court found S–16 was unknown to the parties at the time of the Agreement, was not mentioned in the negotiations, and there was no discussion of primary versus secondary offerings. Thus, there is no issue of witness credibility in this case. Rather the trial judge based his conclusion upon his reading of the words of the Agreement in the context of subsequent developments—changes in Form S–16 and its use, listing of GMC stock on the New York Exchange—which are undisputed.

When the findings of a trial court are based on documentary, rather than oral evidence, they do not carry the same weight on appellate review. The appellate court is equally capable of examining documents,

---

5. The corporate issuer is always the registrant.

depositions and stipulations, and drawing its own conclusions. Our independent judgment, however, should not be substituted without regard to the trial court's findings and unless those conclusions are clearly erroneous. *Aetna Cas. & Sur. Co. v. Hunt,* 486 F.2d 81 (10th Cir. 1973); *Commercial Standard Ins. Co. v. Universal Underwriters,* 282 F.2d 24 (10th Cir. 1960). We do conclude that reversal is necessary.

While Form S–16 in a sense is a successor to Form S–7, it was in existence when the Agreement was executed August 26, 1971. Therefore, we have to look at the paragraph in context to ascertain the parties' meaning. When the reference was to Form S–1, S–7 "or any successors to such forms," did the parties intend: any other form on which a registration of GMC stock might be made, *i. e.,* an "et cetera" interpretation; forms developed only after the Agreement was executed which took the place of S–1 or S–7; forms which might be in existence at the date of execution but were modified later to replace and render obsolete one of those forms; forms developed only after the Agreement which could serve as an alternative to use of S–1 or S–7; forms which might have existed before the agreement which either by later modification or change in usage became alternatives to use of S–1 or S–7; all of the above, or other semantic distinction? We believe most, if not all, of these interpretations are possible if we look only at the words "Form S–1, S–7 or any successors to such forms."

But if we look at ¶ 11 as a whole a different impression emerges. It declares in relatively clear language that if GMC files a registration statement for a public offering of its common stock the Jennings have a right to tagalong, and have at least 5,000 of their shares sold. On its face that would seem to refer to a primary offering by GMC of its stock on its own behalf. But, of course, the company itself is the registrant, technically, in wholly secondary offerings on behalf of some of its shareholders. Thus, standing alone the conflict is not resolved between GMC's contention the paragraph was to treat only situations where a primary offering was made, and

the Jennings' argument it was intended to apply to either primary or secondary offerings.

The paragraph 11 continues to the effect the Jennings must agree to sell "using the same underwriters and at the same time and price and under the same conditions as the Buyer [GMC]," and pay its proper share of fees and expenses paid by GMC in connection with the registration. Again the language appears to contemplate a primary offering on GMC's behalf with tagalong rights. But in a wholly secondary offering where GMC is the required registrant, it would be logical to require all participants to use the same underwriters, price, conditions, and share the costs.

Part (ii) of ¶ 11, however, contains a requirement which cannot apply to any registration except one in which GMC is making a primary offering. It states a formula be applied for reducing the number of shares offered by the Jennings should they, together with others having comparable tagalong rights, request registration of an amount exceeding "50 percent of the total number of shares of common stock of the Buyer [GMC] to be included in such registration statement." Subsection (ii) of ¶ 11 has only one possible interpretation: the total tagalong amount for shareholders in the position of the Jennings may not exceed 50% of the total number of shares in a primary offering by GMC. The obvious purpose is to allow GMC to hold down the number of shares in the secondary part of the offering so it will not unduly affect the success of the primary offering on behalf of the company.

■ A court, of course, must be extremely careful in referring to actions of parties after a contract is executed as an aid to interpreting intention, particularly actions of one party not concurred in by the other. Nevertheless, the trial court found neither side's attorneys were aware of Form S–16 at the time of execution of the Agreement, and GMC obviously had no objections to allowing the Jennings' stock to be sold in an S–16 offering as late as November 1972.

Thus, it seems relevant to note how reference to Form S–16 was handled by GMC once it became known and was available for use by GMC stockholders. As noted above, that company was aggressive in acquiring other corporations by the same type of stock-for-stock exchange, both before and after the Mid-West acquisition. Between 1967 and August 26, 1971, it acquired 18 companies. In 12 contracts tagalong rights were given substantially identical to those in ¶ 11 of the Mid-West Agreement; in five no rights were given; in one tagalong privileges were given for any registration under the Securities Act of 1933. But commencing in January 1972 through October 1973 GMC made nine more acquisitions, in eight of which S–16 rights were mentioned.

In these contracts Form S–16 ' was not simply added to the list of forms in a ¶ 11 type provision to make it read "S–1, S–7, S–16 or any successors to such forms." Rather the equivalent of ¶ 11 of the Mid-West Agreement was retained in nearly the same language, but a new paragraph was added substantially identical to the following:

> During the period beginning July 1, 1972 and ending two years after the Closing Date, upon the written request of one or more of the Stockholders covering not more than 1,500 shares of Buyer's Stock or Additional Shares, the Buyer shall promptly file a registration statement covering such stock under the Act on Form S–16 or any successor thereto and use its best efforts to cause such registration statement to become effective and remain in effect for a period not to exceed 180 days; provided, however, that (i) no more than one such request can be made during any 12-month period and no such request can be made during the period beginning with notification to the Stockholders under paragraph 12 above and ending on the completion of the public offering described in paragraph 12; (ii) the Stockholders requesting such registration shall pay all fees and expenses thereof including, but not limited to, the fees and expenses described in clause (i) of paragraph 12 and any legal or audit

fees incurred by Buyer in connection with such registration; (iii) sales under the registration statement will be made only as permitted by Form S–16, the Stockholders as a group shall not sell thereunder more than an aggregate of 1,000 shares of Buyer's Stock on any one day without the prior approval of the President or a Vice President of Buyer, and prior to the filing of the registration statement the Stockholders shall advise the Buyer in writing of the proposed method and manner of such sales and the underwriter or underwriters proposed to be used all of which shall be satisfactory to Buyer; (iv) no Stockholder shall sell under the registration statement without first notifying the President or any Vice President of Buyer, and if, upon such notice such Stockholder is advised that the registration statement must be updated or otherwise amended to comply with the Act before any sales can be made thereunder, then such Stockholder shall not sell any Buyer's Stock or Additional Shares during the period beginning with such advice and ending on the date he is notified that the registration statement does comply with the Act; provided that the period during which the Buyer is obligated to keep the registration statement effective hereunder shall be extended by the duration of the period referred to in this clause (iv); and (v) the Stockholders requesting such registration and Buyer shall enter into reciprocal indemnity agreements covering liability for any misrepresentations or omissions in the registration statement based on information supplied or failed to be supplied by the other party.

Philadelphia Surgical Instrument Co. Acquisition Agreement dated 1/31/72, ¶ 13.

From the language of the quoted section the parties to those Agreements obviously thought S–16 required a somewhat different approach. Those persons who were given S–16 rights were entitled to force GMC to register and sell their shares in an S–16 offering. The number of such requests were limited in a given period of time;

stockholders were required to pay all costs including legal and audit fees; only a limited number of shares could be sold under the registration in any one day (obviously to prevent depressing the market in GMC shares); stockholders selected the method and manner of sales and the underwriters to be used; stockholders and GMC exchanged indemnity agreements covering liability for misrepresentations and omissions.

These provisions which we believe are normal, and some of them necessary, if S–16 offerings are to be made, demonstrates that wholly secondary registrations are different from primary registrations with tagalong secondary offerings. We are convinced ¶ 11 was intended only to give tagalong rights to primary offerings on behalf of GMC.

Had Form S–16 been known and available for use by GMC stockholders at the time of execution of the Agreement, GMC might well have extended the right to use it, and to demand registration, to the Jennings. It apparently did just that in eight of nine acquisitions after the form became known to the company. GMC had no hesitancy, apparently, to allow the Jennings to participate in its only S–16 offering in November 1972, as evidenced by the call to Carnahan.

But it does not follow that ¶ 11 should be interpreted to grant S–16 rights to the Jennings. The actions of GMC in calling Carnahan and others appear to be those of an accommodating management, not the acknowledgment of a legal obligation. The keys to our conviction that ¶ 11 was not intended to require inclusion of the Jennings in wholly secondary offerings are that the overall language of the ¶ 11 obviously contemplates a different situation than is involved in a wholly secondary offering, and the Jennings were given no right in ¶ 11 to demand a secondary offering of their stock, as would be expected if they were not to be dependent upon the company initiating an offering on its own behalf.

We therefore reverse and remand the cause with instructions to enter judgment in favor of GMC.

McKAY, Circuit Judge, dissenting:

As is typical of most contract disputes, we are called upon to apply contract language to a circumstance not contemplated by the parties. What the parties did not contemplate was that GMC would conduct a secondary registration utilizing an S–16 registration form. The question is whether plaintiffs' contractual right to receive notice of registrations applied to the one undertaken. The majority answers this question in the negative. I would answer affirmatively.

I believe the parties' contract clearly indicates that plaintiffs wanted an opportunity to sell their restricted shares as soon as possible. It also indicates that the defendant was willing to provide that opportunity. To facilitate this understanding, GMC was required to notify plaintiffs of any proposed registration of its common stock, when such registration would utilize SEC forms "S–1, S–7 or any successors to such forms." Form S–16 was unknown to the parties at the time, but it was the one ultimately employed by GMC. Although the majority concedes that it is possible to regard form S–16 as a "successor" form "in a sense," it discerns sufficient reason in the contract to hold clearly erroneous the trial court's finding that it was a successor form that would trigger the contract's notice requirement. Regardless of whether or not the clearly erroneous test properly applies to the issue on appeal, I believe the majority's basic conclusion is unsound.

The majority makes much of the distinction between primary and secondary offerings, determining that the contract can only be read to cover primary ones. But the parties made no express distinction of this nature. In addition, the S–1 form, specified by the parties as one that would trigger the notice requirement, is a form used for both primary and secondary offerings. The majority finds support for its primary offering emphasis in the contract language limiting tag-along rights to 50 percent of the total number of shares included in a given registration. I do not find this analysis to be

convincing. It is true that the limitation was designed to protect GMC in a primary offering situation, but that limitation does not negative the requirement of notice in the event a secondary offering is utilized, as was possible under form S–1. To glean from the 50 percent limitation the notion that notice of secondary offerings was not required is to discern an intent the parties did not have. It distorts the apparent purpose of their agreement.

I agree with the majority that the post-agreement conduct of GMC is of little utility in a search for intent. The majority nonetheless tries to find some comfort in that conduct. I do not believe it can. If any lesson emerges from GMC's post-agreement conduct, it is that once GMC became aware of form S–16, it began to refer expressly to it in contracts with stockholders like the plaintiffs. Other stockholders were given demand rights and rights of participation in connection with S–16 registrations. The only real distinction that can be made between the plaintiffs and these other stockholders is that the contracts of the latter were entered into after GMC became aware of form S–16. A conclusion as reasonable as any other is that it was always intended that forms such as S–16 would trigger the notice requirement; this was simply made explicit once GMC learned of the form's existence. As the majority acknowledges:

> Had form S–16 been known and available for use by GMC stockholders at the time of the execution of the agreement, GMC might well have extended the right to use it, and to demand registration, to the Jennings.

While I do not read the parties' agreement as sufficient to permit the plaintiffs to *demand* a form S–16 registration, I believe it is reasonable to read the agreement as requiring notice to be given upon utilization of form "S–1, S–7, or any successors to such forms," including form S–16.