Lorraine Ann **MESCHINO**, etc., et al.,
Plaintiffs, Appellants,

v.

**NORTH AMERICAN DRAGER, INC.,**
d/b/a N.A.D., Inc., et al.,
Defendants, Appellees.

No. 87–1777.

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1988.

Decided Feb. 9, 1988.

Rehearing Denied March 11, 1988.

David J. Oliveira, Peter Lawson Kennedy, Adler Pollock & Sheehan Inc., Alfred Factor and Kirshenbaum & Kirshenbaum, Providence, R.I., on brief, for appellants.

Craig M. Walker, with whom Klaus H. Jander, Donald M. Dunn, Joseph T. Cardany, Walter, Conston, Alexander & Green, P.C., New York City, Andrew R. Grainger, P.C. and Peabody & Brown, Boston, Mass., were on brief, for appellee N.A.D., Inc.

Robert P. Powers, with whom Jeffrey C. Melick, Joseph P. Musacchio and Melick & Porter, Boston, Mass., were on brief, for appellee Boehringer Laboratories, Inc.

Joseph L. Doherty, Jr., with whom John C. DeSimone and Martin, Magnuson, McCarthy & Kenney, Boston, Mass., were on brief, for appellee Bay State Anesthesia, Inc.

Before BOWNES, ALDRICH and TORRUELLA, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Plaintiff Lorraine Ann Meschino,[1] while totally anesthetized on the operating table for a surgical procedure, suffered an episode of cardiac arrest due to an insufficient oxygen supply, resulting in damage to her brain. One immediate cause of the oxygen deficiency was defendant registered anesthetic nurse Woitkowski's insertion of a so-called "PEEP" valve manufactured by defendant Boehringer Laboratories, Inc. into the supply side of plaintiff's ventilation circuit instead of into the exhaust side.[2] This was but one of a number of serious errors by her, and by defendant anesthesiologist, Dr. Fleet, who, jointly with her, will sometimes be referred to as the medical defendants. The medical defendants settled out during trial, and the trial continued as against Boehringer, North America Drager, Inc., hereinafter NAD, the maker of the anesthesia machine, hereinafter Narkomed 2, and Bay State Anesthesia, Inc., its supplier to the Lahey Clinic, where plaintiff's operation was performed. Lahey Clinic, originally named as a defendant, had received a voluntary dismissal. The remaining issues were the corporate defendants' alleged faults, and whether the medical defendants' faults were, in effect, exculpatory, viz., superseding cause. The court directed a verdict in favor of Bay State at the end of plaintiff's case, and ultimately the jury answered special questions favorably to the other two defendants. Plaintiff complains as to these re-sults, and to the court's rulings on evidence in a number of particulars. We affirm in part and reverse in part.

We start with liability. The special questions answered by the jury were as follows.

### SPECIAL VERDICT FORM

1. Do you find that any of the doctors, nurses, or technicians, including either Dr. Shelly Fleet or Nurse Nancy Woitkoski [sic], were negligent on October 14, 1983 in the treatment of the plaintiff, Lorraine Anne Meschino?
ANSWER: YES ✓  NO __
If the answer to Question #1 is Yes proceed to Question #2.
If the answer to Question #1 is No proceed to Question #3.
2. Was the negligence of the doctors, nurses or technicians, including either Dr. Fleet or Nurse Woitkoski [sic], the sole cause of Lorraine Meschino's injury?
ANSWER: YES ✓  NO __
If the answer to Question #2 is No proceed to Question #3.
If the answer to Question #2 is Yes proceed no further and report to the Court that you have reached a verdict.

There followed eleven questions dealing principally with individual alleged faults of NAD with regard to the machine, and Boehringer with respect to the PEEP valve, which, pursuant to the form's instructions, were not reached.

While Questions 1 and 2 might, perhaps, have been differently worded, examination of the questions following, addressed to defendants' individual alleged faults, as well as examination of the charge itself, satisfies us that, by their given answers, the jury had concluded that defendants were free of fault.[3] To read the questions

---

1. Her husband and children, co-plaintiffs, will not be referred to.

2. PEEP is an acronym for "positive end expiratory pressure", and a PEEP valve is never intended to be used on the inhalation side. The two sides are plainly marked (although initially plaintiff claimed it could have been plainer), all of which Woitkowski testified she well knew.

She was unable to account for how she could have made the mistake.

3. Possible exposure of the corporate defendants commenced with the attachment of the PEEP valve, and these defendants argued that plaintiff's injury had already occurred, due to negligence of the medical defendants, in which event

otherwise would, moreover, have made superfluous the unanswered Question 13, addressed to superseding cause. It follows that plaintiff's extensive argument that the court erred in submitting, and charging upon, superseding cause as an alternative defense, terminating, so to speak, defendants' faults, is irrelevant. If defendants were free of fault, there was nothing for them to be relieved from. We proceed, accordingly, to those matters which allegedly improperly damaged plaintiff's attempts to obtain a favorable answer to Question 2.

The complaint most stressed, made in a number of ways, is based on the ultimate fact that plaintiff failed to afford the jury a view of the actual Narkomed 2 machine involved, which was still in use (unchanged) at the Lahey Clinic, or of a duplicate, to aid in its understanding, and weighing, her criticisms, as advanced by her expert.

The Narkomed 2 machine is a comprehensive device which, using a single tube, introduces controlled amounts of anesthesia and oxygen and then exhausts the patient's lungs, completing the ventilation cycle. The patient's own breathing may accomplish the cycle, or it may be forced automatically, or by manual activation. In certain circumstances a PEEP valve, a check valve limiting flow to one direction, must be inserted in the exhalation line to maintain pressure in the lungs. Plaintiff's care prior to surgery had required and employed such a valve. Because she had not researched plaintiff's history, Dr. Fleet had failed to have a PEEP valve immediately at hand, and began administration of anesthesia while one was being sent for. Fifteen minutes before incision, she left instructions with Woitkowski to install the PEEP valve on its arrival, and returned to her office. The valve arrived prior to incision, but Woitkowski neglected to install it. Upon incision, the surgeon noticed that plaintiff's blood was darkened, indicating inadequate oxygenation. A remark by a surgical resident that plaintiff had been under PEEP before the procedure reminded Woitkowski of the need for the valve, and she thereupon installed it, inexplicably in the wrong line. The effect of this on the patient was noticed rather quickly, but the source of the breathing impediment was not discovered until Dr. Fleet returned to the operating room in response to an emergency page.

Plaintiff abandoned her complaint that the inhalation side, and exhalation side, of the machine were not adequately marked, but she contended as to another improper marking, and that there was no warning device which would have revealed that the oxygen supply had been cut off.

Without pausing to examine the alleged errors that had prevented plaintiff from presenting a Narkomed 2 to the jury, we start with the bottom line, the court's response to counsel's statement that it "would be helpful." The court said,

> Frankly, counsel, I think that the diagrams, the photographs, the testimony, has all been very clear and very direct, almost simplistic, if I may use that term.

Spelling this out, the jury had before it a number of photographs and diagrams, some of which were explained even at the jury rail, and which also were blown up by transparencies. Nor can we resist pointing out that plaintiff had been permitted to make a video tape of the instant machine, and had not even offered it. It is difficult to think how the statement in plaintiff's brief, "a view was the only means available to Lori [Mrs. Meschino] to permit the jury to understand the operation of the Narkomed 2" can have been made in good faith. Under the circumstances, we may wonder whether plaintiff's real interest was not the machine, but the contention that she sought to present to the jury that she had been frustrated by defendants' successful efforts "to conceal the truth," —a claim now made several times in her brief.

■ Seeking to persuade the court to present this issue to the jury, plaintiff offered a memorandum of law in support of a motion, but no affidavit or other form of

the acts of corporate defendants could not have been a cause. If the jury's answers meant this,

it would not affect this opinion, except to make some of it superfluous.

evidence. The facts so alleged were these. Plaintiff's expert, Dr. Allen was apparently able to procure for plaintiff, from his own hospital, a Narkomed 2 machine substantially similar to the one used in plaintiff's operation. As a condition thereof, however, the hospital demanded that plaintiff procure the purchase of a replacement machine, and this plaintiff was prepared to do. Apparently the replacement was to be an updated version, a Narkomed 2A, of the model in question. Plaintiff claimed that when it was learned for what purpose Dr. Allen sought to buy a Narkomed 2A, defendants NAD and Bay State in bad faith thwarted the purchase, thus preventing the release of the relevant Narkomed 2 machine for proffer at trial.

Plaintiff has cited to us cases authorizing an unfavorable inference when a party procures the suppression of relevant evidence within its control. The facts here were somewhat different. Defendants had control of a replacement Narkomed 2A machine, which itself would not have been relevant. No one contended that they had control over a relevant Narkomed 2 machine, the predecessor model apparently being out of production. Plaintiff contends that by suppression of the sale of the replacement machine, defendants denied her access to evidence which was, as a practical matter, as much subject to defendants' control as if they had owned it. These contentions, if true, would have presented the trial court with an interesting variant of the question resolved in the decided cases.

It is unnecessary to decide whether plaintiff was entitled to an instruction. Her motion, as to which she bore the burden, addressed a highly factual matter of her expert's thwarted efforts to purchase a machine. She provided the trial court with no evidence (although she sought to examine defendant's personnel thereon) to support her motion, even though an affidavit of her own expert ought to have been easily had. Under the circumstances, there was neither a factual basis for allowance of her motion as a whole, nor for a jury instruction, in whatever form presented.

■ But even if plaintiff had adequately presented her claim, this is not a case of an obvious unfavorable inference once intentional concealment had been established. Would a presentation of the machine have demonstrated the "truth" beyond what was already apparent from the detailed photographs and diagrams? For example, in response to plaintiff's claim that there should have been an alarm specially directed to indicating an obstruction of the inhalation gases, defendants' expert witnesses pointed out several visible, and audible, consequences that should have alerted a trained operator without the need of a separate alarm. In her brief plaintiff argues that with the machine the jury might have seen the "absurdity" of these contentions. If plaintiff's witnesses had testified to absurdity, and needed the machine to demonstrate this, that would have been one thing. They testified to the need of an alarm, but not to need of a physical demonstration, much less to absurdity. What plaintiff may have lost was not "truth," but an opportunity for counsel's arguments to play upon an impressionable lay audience, unable to gauge. Defendants might well be apprehensive that possible adverse confusion, rather than truth could result from a presentation of the actual machine.[4] The court might well not wish to engage in a mini-trial, and its sympathy with plaintiff, who had had three years to prepare, and even had a video tape which she did not use, was obviously minimal. We are not tempted to overrule its discretion.

■ Plaintiff further objects to the court's exclusion of two articles published in *Health Devices Magazine.* She sought to introduce a December 1985 article entitled "PEEP Valves" against Boehringer, and a July 1981 article entitled "Ventilation Alarms" against NAD. The basic question was qualification under Fed.R.Evid. 803(18), whether the article had been "established as a reliable authority." With respect to Boehringer, plaintiff did not

4. The writer has seen a simple patent diagram become almost incomprehensible, and "highly ingenious," and hence inventive, when a device that incorporated it was introduced in specie.

even get off the ground. Passing the question of its sufficiency, the testimony on which she relied had been given by her expert, a Dr. Raemer, two days before in connection with another article, and was expressly limited to NAD. No do we accept plaintiff's contention of admissibility to impeach the witness then on the stand regardless of whether it had been qualified under the rule. Fed.R.Evid. 803, advisory committee's notes, Exception (18).

■ We add that in any event we would not accept plaintiff's argument that the contents of all issues of a periodical may be qualified wholesale under Rule 803(18) by testimony that the magazine was highly regarded. In these days of quantified research, and pressure to publish, an article does not reach the dignity of a "reliable authority" merely because some editor, even a most reputable one, sees fit to circulate it. Physicians engaged in research may write dozens of papers during a lifetime. Mere publication cannot make them automatically reliable authority. The price of escape from cross-examination is a higher standard than "qualified," set for live witnesses who do not. The words have a serious meaning, such as recognition of the authoritive stature of the writer, or affirmative acceptance of the article itself in the profession. For this reason we concur in the exclusion of the "Ventilation Alarms" article against NAD. Furthermore, as to NAD, plaintiff may not rely on Dr. Raemer's testimony to predicate error on the part of the court; his testimony was never brought to its attention as providing a foundation for the "Ventilation Alarms" article.

■ Plaintiff further contends that NAD may not object to the introduction of this article because "NAD had admitted the authoritative nature of the article for purposes of its use at trial by listing it as a proposed trial exhibit." We do not equate the listing of an exhibit on a pre-trial submission with a binding response to a request for admission under Fed.R.Civ.P. 36. The comparison is ill-founded; by listing the name of a witness in a pre-trial document, a proponent does not waive the right to impeach that very witness, or, indeed, to conclude not to call him. The contention is without merit.

■ Plaintiff also contends that she was denied the opportunity to lay a foundation for "Ventilation Alarms" through the cross-examination testimony of one of NAD's experts. Strictly this was not cross-examination, but was making the witness hers, pro tanto. Plaintiff concedes that the witness characterized the article as "spotty," and does not contest that the testimony on the record falls short of a foundation as authoritative. She complains that the court based its ruling on the characterization as "spotty" and then excluded a further question seeking to elicit a more favorable answer from the witness.

Upon exclusion of the question at issue, counsel proceeded immediately to another line of inquiry. Plaintiff made no offer of proof, nor does she now argue that she had any basis (in deposition testimony or otherwise) to expect that an opponent's witness would recant his unfavorable testimony so as to provide a foundation for the article. Inasmuch as the court's attention was directed to no grounds for reconsideration of its exclusion of plaintiff's renewed questioning, the ruling must stand. It was tantamount to a ruling that the question at issue had been asked and answered, and such rulings will not be disturbed in the absence of an abuse of discretion. *Harrington v. United States*, 504 F.2d 1306 (1st Cir.1974). None has been shown.

■ Finally, we turn to Bay State, whose motion for a directed verdict was granted at the close of plaintiff's case. The court, having denied NAD's motion as a result of rejecting its claim that plaintiff had failed to show a breach of warranty, correspondingly rejected Bay State's claim. However, it ruled in favor of Bay State on the ground that plaintiff had failed to prove that Bay State had been the seller of the machine.

With the greatest respect, we find this incomprehensible. To begin with, in support of its motion Bay State argued,

They have to demonstrate that Bay State sold that machine.... They have to introduce some evidence because the jury has nothing right now in front of them to suggest that Bay State was, in fact, the distributor.... There wasn't a darned thing to show the element of a sale here. And that is absolutely necessary.... Plaintiffs never took time to address the issue of a sale.... They were busy. They had their hands full. They're trying to prove a medical case, trying to prove a case against two other product people.

I was the fortunate beneficiary of that, your Honor, because they just forgot that element of their case; but I am saying that, fortunate or unfortunate beneficiary, I am still entitled to it right now.

Plaintiff responded that the fact that Bay State had sold the system to the Lahey Clinic was alleged in the complaint, and admitted in the answer. To this Bay State replied that this had not been brought to the jury's attention.

THE COURT: I might agree with you, Mr. Doherty [counsel for Bay State]. The jury doesn't know that.... All the plaintiff says is: Well, they admit it in their answer and, therefore, it is deemed admitted. I don't believe that is the case. It might be.

The discussion then turned, we might say mirabile dictu, to consideration of the principles of judicial notice, and to the claim that, after plaintiff had rested, it was late in the day. Plaintiff suggested reopening, so that the jury might be informed.

THE COURT: Why should I do that? Poor Mr. Doherty's been sitting back there saying to himself, "I am going to lawyer this case the best way I know how." Now you want to take away the fruit of his victory.

The matter was then adjourned to the following morning for reflection, at which time plaintiff expanded her argument on the subject of judicial notice, citing Fed.R.

Evid. 201(f) and cases thereunder, and concluding that the admission of Bay State in its answer was a binding admission which the court "must instruct the jury to accept ... as conclusive.... I would state the judicial admissions absolutely eliminate the need for the admission of any evidence.... Bay State's motion should be denied."

THE COURT: All right. First, you say that the answers to the complaint, amended complaint, are admissions. The rule, I think, is otherwise....

So I think the gate is closed on Bay State, and I will grant their motion for directed verdict.

"Poor Mr. Doherty" had done an excellent job of "lawyering." And where was plaintiff? Passing the fact that judicial notice, unlike answers to interrogatories, depositions, etc., referred to by the court, may be "taken at any time," Fed.R.Evid. 201(f), what had become of Fed.R.Civ.P. 8(d)? [5] What had become of the stipulated Pretrial Statement of Issues To Be Tried, which, consistently with the answer, conspicuously omitted any question of Bay State's sale and commenced with whether it has breached a warranty?

We feel sure that the books could be searched in vain for authority that it is appropriate to direct a verdict against a plaintiff because she had failed to offer evidence of something unreservedly admitted in the defendant's answer, or had not earlier, i.e., before the motion was filed, called the admission to the court's attention —noting it at the time of argument being too late. We find it hard to believe that this could have occurred. We add that it seems as unjust as it was improper.

The battle of the wooden soldiers, or more strictly, of the unarmed soldiers, continues in this court. Bay State's sole argument consists of a single assertion: "... there is no basis upon which the jury could have found that Bay State sold the machine to Lahey." No mention is made of Fed.R. Civ.P. 8(d), or of the stipulated issues. Plaintiff continues to rely on Fed.R.Evid.

---

**5.** "(d) *Effect of Failure to Deny.* Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."

201(f) as to judicial notice, and adds case authority pertinent thereto, but no authority pertinent to Fed.R.Civ.P. 8(d). Nonetheless, in spite of herself, we must rule that plaintiff is correct; a verdict should not have been directed contrary to defendant's answer.

Alternatively, in this court, as it did below, Bay State argues that plaintiff did not put in a case on the merits. While we might regard her case as thin, as confirmed by the jury's finding against a helpless plaintiff, we need not add to the substantive reasons expressed of record by the court for denying the motion on this ground. Bay State cannot succeed here.

■■■ Finally, Bay State contends that since in the matter of warranty,[6] it and NAD were in the same boat (which, of course, is true, *see, e.g., Everett v. Bucky Warren, Inc.,* 376 Mass. 280, 380 N.E.2d 653, (1978); *Killeen v. Harmon Grain Products,* 11 Mass.App. 20, 413 N.E.2d 767 (1980)), plaintiff, having had a full trial, should be collaterally estopped by the findings and judgment in favor of NAD. For this it cites *B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7 (1st Cir.1984) seemingly without observing that we there noted that while this is the general rule,[7] Massachusetts adheres to principles of mutuality and, for collateral estoppel, requires identity of parties. *See* 727 F.2d 12, n. 2. While there are, indeed, statements to this effect in some Massachusetts opinions, it is possible that there are exceptions that *B.C.R. Transport* failed to realize. The burden of showing error on our part, however, is on Bay State, and, even had it been relevant, this burden is not met by its citing one district court case. We will not do counsel's work for him.

By removing itself at the close of plaintiff's case Bay State sought a heads-I-win, tails-you-lose situation since collateral estoppel, in all probability, would not work offensively, i.e., plaintiff probably could

not, if the directed verdict were ultimately vacated, use a finding in its favor against Bay State, but Bay State could, but for the apparent Massachusetts rule, use the finding defensively if plaintiff lost. Instead, Bay State now finds itself at the dead end of a one-way street, as it has now been litigated and determined that it cannot use the findings and judgment in favor of NAD defensively.

*The judgments for North American Drager, Inc. and Boehringer Laboratories, Inc. are affirmed; the verdict and judgment in favor of Bay State Anesthesia, Inc. are vacated and a new trial ordered.*[8]

## OPINION ON PETITIONS FOR REHEARING

### PER CURIAM.

Bay State requests reconsideration of our decision that the judgment in NAD's favor cannot be used defensively by way of collateral estoppel to bar a new trial against it. Because of the consequences NAD fears for itself by way of a possible indemnity claim it joins in Bay State's request, by separate petition. The petitions are denied.

■■■ In its original brief, in addition to claiming, without a scintilla of supporting authority, that the admission in its answer was to be ignored, in disregard of Fed.R. Civ.P. 8(d), Bay State argued that even if the directed verdict was error, it should succeed on this appeal if NAD succeeded. We recite its brief.

II. THE JUDGMENT ENTERED IN FAVOR OF BAY STATE SHOULD BE UPHELD ON THE BASIS OF THE JURY VERDICT, REGARDLESS OF WHETHER BAY STATE WAS ENTITLED TO A DIRECT VERDICT

---

**6.** Plaintiff did not charge Bay State with negligence.

**7.** *See, e.g., Brown v. R.D. Werner,* 428 F.2d 375 (1st Cir.1970) (N.H. law).

**8.** Since this reversal is on a purely technical ground, it is suggested that this is a case that might be an exception to the local district rule calling for a re-drawing, the complications of the case on the merits indicating advantages in its remaining with the same judge.

Even if this Court were to determine that Judge Mazzone should not have directed a verdict in favor of Bay State, the Judgment in favor of Bay State should be upheld on the basis of the jury verdict in favor of N.A.D. [Footnote omitted] As discussed previously, the only claim presented by the plaintiffs against Bay State was for breach of warranty, based upon allegations that the Narkomed 2 machine was defective and that Bay State was a link in the chain of sale from N.A.D. to the Lahey Clinic. Bay State could not have been found liable unless the jury determined that the Narkomed 2 machine was defective and that the defect caused Mrs. Meschino's injuries. Such a determination would have also resulted in a finding against N.A.D. Indeed, Bay State could not have been found liable, based upon the claims presented, without N.A.D. also having been found liable. Consequently, a finding that N.A.D. is not liable necessarily requires a finding that Bay State is not liable.

The verdict returned by the jury upon special questions related only to the issue of causation. The jury found that the negligence of doctors, nurses or technicians at the Lahey Clinic was the "sole cause" of the injuries to Mrs. Meschino.

\* \* \* \* \* \*

The causation question, decided by the jury, was a "common factual issue" relative to the claims against both N.A.D. and Bay State. *B.C.R. Transport Co., Inc. v. Fontaine*, 727 F.2d 7 (1st Cir., 1984). The issue was "actually litigated" at trial and was "necessary to the determination" of the claims against N.A.D. Moreover, the plaintiffs clearly had "substantial control" over the litigation. *Kalman v. Berlyn Corp.*, 614 F.Supp. 1327, 1330 (D.C.Mass., 1985). Consequently, unless this Court were to overturn the jury verdict and the judgment in favor of N.A.D., the plaintiffs are precluded from relitigating the question of causation against Bay State and

the Judgment entered in favor of Bay State, therefore, must be upheld.

In ruling against Bay State we stated,

Finally, Bay State contends that since in the matter of warranty [footnote omitted] it and NAD were in the same boat (which, of course, is true, *see, e.g., Everett v. Bucky Warren, Inc.*, 376 Mass. 280, 380 N.E.2d 653, (1978); *Killeen v. Harmon Grain Products*, 11 Mass.App. 20, 413 N.E.2d 767 (1980)), plaintiff, having had a full trial, should be collaterally estopped by the findings and judgment in favor of NAD. For this it cites *B.C.R. Transport Co., Inc. v. Fontaine*, 727 F.2d 7 (1st Cir.1984) seemingly without observing that we there noted that while this is the general rule, [footnote omitted] Massachusetts adheres to principles of mutuality and, for collateral estoppel, requires identity of parties. *See* 727 F.2d 12, n. 2. While there are, indeed, statements to this effect in some Massachusetts opinions, it is possible that there are exceptions that *B.C.R. Transport* failed to realize. The burden of showing error on our part, however, is on Bay State, and, even had it been relevant, this burden is not met by its citing one district court case. We will not do counsel's work for him.

In light of the fact that Bay State had obtained its directed verdict by what even the district court regarded as "lawyering,"[1] we saw no reason to come to its rescue by going behind our single decision which Bay State itself had cited (*B.C.R. Transport*). We said,

By removing itself at the close of plaintiff's case Bay State sought a heads-I-win, tail-you-lose situation since collateral estoppel, in all probability, would not work offensively, i.e., plaintiff probably could not, if the directed verdict were ultimately vacated, use a finding in its favor against Bay State, but Bay State could, but for the apparent Massachusetts rule, use the finding defensively if plaintiff lost. Instead, Bay State now finds itself at the dead end of a one-way street, as it has now been litigated and

---

**1.** Bay State's position was that it was immaterial that plaintiff "simply forgot."

determined that it cannot use the findings and judgment in favor of NAD defensively.

In its petition Bay State asserts that we "misapprehended or overlooked Massachusetts law concerning the issue of collateral estoppel."

Counsel for Bay State apologizes to this Court for the fact that the misapprehension of Massachusetts law may have been caused by Bay State's citation of *B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7 (1st Cir.1984). Bay State submits, however, that *B.C.R. Transport* was cited only in support of the fact that collateral estoppel applies when there is a "common factual issue" (Bay State's Brief, p. 25). The case was not cited in relation to any questions of mutuality or identity of parties, because Bay State did not perceive those questions as being germane to this action. Based upon the fact that Bay State was a party to the action throughout the presentation of the plaintiffs' case, as well as the fact that Massachusetts has not required identity of parties in regard to the defensive use of collateral estoppel since the 1968 decision in *Homeowners Federal Savings & Loan Association v. Northwestern Fire and Marine Insurance Co.,* 354 Mass. 488 [448], 455 [238 N.E.2d 55] (1968), Bay State maintains that its failure to perceive or address issues pertaining to mutuality or identity of parties was not unreasonable and should not preclude consideration of the question at this time.

There then follows an extensive briefing of Massachusetts law going back well before *B.C.R. Transport* and suggesting we were there in error.

As an apology this is difficult to accept. It was scarcely necessary to cite *B.C.R. Transport*—or anything else—to show that there was a "common factual issue." It is elementary that a "common factual issue" does not stand alone, but, of necessity, there are additional issues, mutuality (vel non), and identification of parties. Bay State had merely to read its own citation,

*B.C.R. Transport,* and see, fully flagged, that we had held that the Massachusetts law was against it.

In Massachusetts, collateral estoppel requires the concurrence of three circumstances: "(1) a common factual issue; (2) a prior determination of that issue in litigation *between the same parties;* and (3) a showing that the determination was in favor of the party seeking to raise the estoppel bar." *Commonwealth v. Lopez,* [383 Mass. 497] 420 N.E.2d [319] at 321 [ (1981) ] (emphasis added). Thus, on the second of these three criteria alone— mutuality of estoppel—Fontaine's claim of collateral estoppel/fails. [Footnote omitted] (727 F.2d at 12)

Bay State errs when it says we "misapprehended." We used the phrase "apparent Massachusetts Rule" precisely in order to disclose that we were making no final pronouncement.[2] Nor did we *"over* look" anything. Rather, we pointed out that we did not "look". What Bay State, in spite of its verbiage, is now asking is that we overlook what we can only regard as gross negligence on its part in raising a point and citing nothing but one case, a case that conspicuously spoke against its position. We do not accept its explanation that we made a "demonstrable mistake," as to the Massachusetts law and that it was "not unreasonable" for it not to have briefed it because the law in defendant's favor "came to its judicial repose in ... 1968."

Rather than a mistake, we quoted our previous opinion which, in turn, had quoted a Massachusetts opinion verbatim. *Common. v. Lopez,* 383 Mass. at 499, 420 N.E.2d 319 (1981) (sic). We refrained from saying whether this was correct, and expressly refrained from pursuing the matter. We are bound by our previous decisions unless they can be shown clearly incorrect; Bay State's own citation made obvious what it should have done for itself. This is a busy court, and many times, in order to avoid making bad law we are obliged to supplement work of unperceptive or ineffective counsel. This time we

---

**2.** NAD construes this "as an invitation to set forth the correct state of the Massachusetts law." It most certainly was not. We know how to issue an invitation.

chose not to do counsel's work, and merely noted that we were making no authoritative finding.

▮ We proceed to the next point. NAD, by its separate petition, states that it has standing to object to a new trial for plaintiff against Bay State because, if Bay State loses, then Bay State will come after it, seeking indemnity. Accordingly, it has standing to prevent the possibility of its ultimately becoming the bag-holder. At the same time, it says, we should deny plaintiff the opportunity to try a second time against Bay State because, due to the law of collateral estoppel, "a retrial can produce but one result, to wit, a judgment in favor of Bay State." [3]

Whatever problems there may be in connection with the first point,[4] there are none in the second. Bay State chose to litigate the issue of collateral estoppel and lost. Both it and plaintiffs are parties hereto, and the matter is res judicata.

We have little sympathy for Bay State's predicament. This is a matter of principle; too often we find ourselves obliged to do counsel's work. Nor should counsel expect it who engage in "lawyering," and then want another chance when it is they that are in trouble.

At first blush we might feel differently about NAD. But then, again, we read NAD's nine page present argument, citing 12 Massachusetts cases, and wonder why they are tendered only now. Footnote 4 to its petition supplies the answer.

4. .... *[C]ollateral estoppel ... was raised, presented and briefed to the Court by Bay State in its brief on appeal* (Point II commencing at p. 22), *and NAD (at p. 12 of its brief) expressly incorporated those arguments by reference.* Although the Court found Bay State's treatment lacking and incomplete, the argument was made, and it was adopted by NAD. We are sympathetic to the Court's complaint that it was not adequately supported by counsel in their presentation of this aspect of the law on appeal. *In candor, NAD did not foresee that the Opinion would* reverse as to Bay State and *hold,* as we

3. This ambivalence continues on page 12 of its original brief, post.

4. We do not think it at all clear that Bay State could now pursue a claim for indemnification against NAD. For one thing, it bowed out of the case where everything could have been settled

prove here erroneously, *that Bay State could not rely upon collateral estoppel.* It is now apparent that the Court's ruling on estoppel could expose NAD to claims based on the very warranty allegations which it defeated below. (Emphasis supplied).

This may be an explanation, but it is hardly an excuse. Even less was the statement "at p. 12 of its brief."

NAD respectfully defers to Boehringer and Bay State with respect to the two *issues applicable only to them* and herein incorporates by reference their responses thereto. (Emphasis supplied).

Was NAD so unastute as to think collateral estoppel did not concern it, too (a conclusion it vigorously now denies)? If so, why "incorporate" Bay State's argument? Either NAD woke up late in the game, or it was content to rest on the quite inadequate argument made by Bay State. Either way, it has no one to blame but itself.

These are, we believe, competent counsel; they represent substantial clients, and, money-wise, the case is important. They are entitled to our handling what is presented to us once. We do not care to entertain a petition for rehearing on the ground that we made a demonstrable mistake, when the demonstration was clearly up to the parties and they did not choose to make it.

While this is not as clear a case as *Rodriguez de Quinonez v. Perez,* 596 F.2d 486 (1st Cir.1979), where we denied a petition for rehearing based on the ground that petitioner-appellant had cited the wrong statute, we said, at page 492,

"We find it an intolerable imposition on our time and limited resources to grant a rehearing for the purpose of entertaining arguments addressed to that hitherto undisclosed statute."

It is more difficult for us to look up Puerto Rico statutes than Massachusetts cases, but the principle is the same: we must

at once. Secondly, if the law is that it should have been able to claim collateral estoppel, it lost that benefit by its own conduct. There may be other points—we make no suggestion as to the proper result.

have a right to expect professionalism from the bar.

*The petitions for rehearing are denied.*