APPEL, Justice
(concurring specially).
For the reasons expressed below, I conclude the judgment of the district court must be vacated to allow for an in camera inspection of Jherica Richardson’s mental health records under Iowa Code section 622.10(4) (Supp.2011). I write separately, however, to express my views on the important issues raised in this case and in the companion case of State v. Thompson, 836 N.W.2d 470 (Iowa 2013), also decided today. As will be demonstrated below, the legal issue in these cases with respect to the new statute is not whether the legislature’s solution is “better” than the approach of this court in State v. Cashen, 789 N.W.2d 400, 407-10 (Iowa 2010), but only whether the legislature’s approach is constitutional on its face. See State v. Mauti, 208 N.J. 519, 33 A.3d 1216, 1229 (2012) (stating that where the legislature has enacted a privilege, the court’s “own conclusions about what would be better policy are simply of no consequence”); see also Nat’l Fed’n of Indep. Bus. v. Sebelius, 567 U.S. -, -, 132 S.Ct. 2566, 2600, 2608, 183 L.Ed.2d 450, 464, 499 (2012) (noting it is not the Court’s role to pass upon the wisdom of the Federal Affordable Care Act’s requirement that individuals pay a tax if they do not obtain health insurance, but rather only upon its constitutionality). Although the challenged provisions of the new statute may be constitutionally problematic in some applications, I conclude the statute is facially constitutional when interpreted as explained below.
I also write to more thoroughly explore the issue of whether the photograph and video depicting the medical condition of E.N. were properly admitted into evidence. I conclude this evidence was properly admitted. In addition, I write to elaborate on the question of the admission through expert testimony of hearsay evi *221 dence found in published journal articles. I conclude admission of this evidence was improper.
I. Issues Surrounding Production of Mental Health Records in Criminal Cases.
A. Introduction.
1. Positions of the parties. Neider-bach claims the district court erred in denying his request to review Jherica’s mental health records. According to Neid-erbach, Jherica’s “long stretch of postnatal bizarre behavior and depression” warranted investigation of her records. Neider-bach asserts there may be evidence in the records “that would affect her ability either to perceive events accurately or to credibly testify in court or [that] may establish motive.” Neiderbach claims the failure to produce the mental health records violates the Due Process Clauses of the Iowa and United States Constitutions and his right to effectively cross-examine witnesses.[6]
Neiderbach relies upon our holding in Cashen, where we outlined a protocol related to the production of mental health records in criminal trials. 789 N.W.2d at 407-10. We required production of mental health records in a criminal trial when the defendant shows “a reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant’s guilt.” Id. at 408. Once a defendant made this showing, we required mental health records to be produced under a protective order designed to safeguard the confidentiality of the records. Id. at 408-09. We rejected in camera inspection of the records, explaining that the court “cannot foresee what may or may not be important to the defendant.” Id. at 409.
Neiderbach recognizes that after our decision in Cashen, the legislature amended Iowa Code section 622.10 by adding a new subsection. See 2011 Iowa Acts ch. 8, § 2 (codified at Iowa Code § 622.10(4) (Supp. 2011)). Among other things, the new subsection provides that before discovery of mental health records the defense must show “a reasonable probability that the information sought is likely to contain exculpatory information.” Iowa Code § 622.10(4)(a )(2)(a). Second, the new subsection provides that a defendant seeking production of mental health records must show the information “is not available from any other source.” Id. Once the defendant has shown “a reasonable probability that the privileged records sought may likely contain exculpatory information that is not available from any other source,” the court must conduct an in camera inspection of the documents to determine whether the records contain exculpatory information. Id. § 622.10(4)(a )(2)(b). Neiderbach attacks each of these provisions as a violation of the Cashen principles and his rights to due process and confrontation under the Iowa and Federal Constitutions.
Neiderbach further claims the district court improperly applied section *222 622.10(4)faJ(2)(a) to the facts of this case. Neiderbach notes that, among other things, he presented evidence to the district court that Jherica smoked marijuana during her pregnancy, that she had demonstrated a pattern of dishonest conduct, that she admitted frustration while taking care of her newborn son, that she flashed her breasts two days after her son’s traumatic brain injury, that she threatened to starve herself to get out of jail, and that she called a funeral home to report that her son had died and inquire about services and prices even though he was alive. Neiderbach argues the district court’s conclusion that this evidence did not meet the statutory threshold for production of mental health records was contrary to Anfinson v. State, 758 N.W.2d 496, 505-06 (Iowa 2008), where we found there was a possible nexus between postpartum depression and infanticide. Neiderbach also cites cases noting a witness’s mental condition at the time of events about which he or she testifies can impact credibility. See East v. Scott, 55 F.3d 996, 1003 (5th Cir.1995) (noting mental health records can cast doubt on the accuracy of a witness’s testimony); United States v. Lindstrom, 698 F.2d 1154, 1160 (11th Cir.1983) (“Certain forms of mental disorder have high probative value on the issue of credibility.”).
The State responds by attacking the Cashen protocol, arguing it improperly balances a “defendant’s statutory or rule-based interest in discovery” with a “patient’s qualified constitutional right to privacy in mental health records.” In any event, the State further asserts the challenged provisions of section 622.10(4)(a )(2) are constitutional.[7] According to the State, Neiderbach failed to show a reasonable probability that the mental health records sought were likely to contain exculpatory information and, instead, showed only a possibility that the records might contain exculpatory information. In addition, the State contends Neiderbach failed to show the information sought was unavailable from other sources. Finally, the State asserts that to the extent Neiderbach has met his burden on the question of production of mental health records, the in camera inspection provision of section 622.10(a )(2)(b) is constitutional under Pennsylvania v. Ritchie, 480 U.S. 39, 57-58, 107 S.Ct. 989, 1001-02, 94 L.Ed.2d 40, 57-58 (1987), and because a defendant will have to identify the information sought with reasonable specificity, enabling the district court to better find potentially exculpatory evidence.
2. Evidentiary privilege and the right of a criminal defendant to “every man’s evidence. ” As was noted by the Supreme Judicial Court of Massachusetts, “when relevant evidence is excluded from the trial process for some purpose other than enhancing the truth-seeking function, the danger of convicting an innocent defendant increases.” Commonwealth v. Bishop, 416 Mass. 169, 617 N.E.2d 990, 994 (1993), abrogated on other grounds by Commonwealth v. Dwyer, 448 Mass. 122, 859 N.E.2d 400, 414 (2006). In a similar vein, the United States Supreme Court has said that “disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice.” Dennis v. United States, 384 U.S. *223 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973, 984 (1966). Thus, while the issues surrounding the production of mental health records in this case may appear merely procedural on the surface, they are actually much more important than that. As Justice Frankfurter observed, “The history of American freedom is, in no small measure, the history of procedure.” Malinski v. New York, 324 U.S. 401, 414, 65 S.Ct. 781, 787, 89 L.Ed. 1029, 1037 (1945).
In this case, we must determine whether our procedures related to the production of mental health records in a criminal case will adequately and reliably allow a defendant access to probative information that could bear on his possible conviction and subsequent long term of incarceration. The suppression of important evidence bearing on the truth or the innocence of a defendant in a criminal trial and the refusal to look for available exculpatory evidence in the name of furthering other social goals raise serious questions regarding the rights to due process and confrontation, to say the least, and in their extreme forms, represent the underpinning of show trials and the criminal justice systems of totalitarian regimes. On the other hand, unnecessary disclosure of mental health records is inconsistent with the legislative policy behind privilege statutes and our recognition of the privacy interests of mental health patients. See McMaster v. Iowa Bd. of Psychology Exam’rs, 509 N.W.2d 754, 758-59 (Iowa 1993).
Looking broadly at modern legal developments, the arc of the caselaw seeks to ensure a defendant has access to evidence sufficient to provide a fair trial. See, e.g., Ritchie, 480 U.S. at 57-58, 107 S.Ct. at 1001-02, 94 L.Ed.2d at 57-58 (holding due process requires that a statutory privilege give way to in camera inspection of exculpatory evidence); Davis v. Alaska, 415 U.S. 308, 318-20, 94 S.Ct. 1105, 1111-12, 39 L.Ed.2d 347, 354-56 (1974) (holding juvenile records made confidential by statute admissible to show witness bias); Chambers v. Mississippi, 410 U.S. 284, 298-302, 93 S.Ct. 1038, 1047-49, 35 L.Ed.2d 297, 310-13 (1973) (holding a defendant’s right to present witnesses in his own defense permitted the defendant to present hearsay testimony under the exception for declarations against a declarant’s penal interest notwithstanding Mississippi’s failure to recognize such an exception); Washington v. Texas, 388 U.S. 14, 16-17, 22, 87 S.Ct. 1920, 1922, 1925, 18 L.Ed.2d 1019, 1021-22, 1025 (1967) (holding a criminal defendant’s right to have compulsory process for obtaining witnesses in his defense trumped a state statute prohibiting persons charged or convicted as coparticipants in the same crime from testifying on each other’s behalf even if they would have given relevant and material testimony).
3. Importance of the doctrine of constitutional avoidance to the interpretation of legislative acts. As noted, the legislature codified a protocol for the production of mental health records in response to our Cashen decision. The new statute seeks to modify the Cashen protocol in several key respects, including substituting in camera inspection of documents for production of documents to the parties under the control of protective orders.
Legislative enactments are entitled to great respect and may be held constitutional even if the court disagrees with the policy choices of the legislature. At the same time, however, the legislature cannot deprive a criminal defendant of his or her constitutionally protected right to due process. Under one principle of constitutional avoidance, we seek to interpret a legislative enactment in a fashion that avoids constitutional problems. Simmons v. State Pub. Defender, 791 N.W.2d 69, 74 (Iowa 2010); State v. Nail, 743 N.W.2d *224 535, 539-40 (Iowa 2007); State v. Wiederien, 709 N.W.2d 538, 542 (Iowa 2006); State v. Kueny, 215 N.W.2d 215, 216-17 (Iowa 1974); see also Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688, 712 (1936) (Brandeis, J., concurring) (“‘When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.’” (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598, 619 (1932))). This principle is an important feature of the judicial review landscape. Several state courts have applied it to uphold statutes dealing with counseling privileges. See, e.g., People v. Stanaway, 446 Mich. 643, 521 N.W.2d 557, 574-75 (1994); Commonwealth v. Ritchie, 509 Pa. 357, 502 A.2d 148, 151-54 (1985), rev’d on other grounds by Ritchie, 480 U.S. at 60-61, 107 S.Ct. at 1003, 94 L.Ed.2d at 59-60. A corollary to the doctrine of constitutional avoidance is the notion that statutes should not be lightly found facially unconstitutional. In order to be unconstitutional on its face, a statute must be “ ‘void for every purpose and cannot be constitutionally applied to any set of facts.’” War Eagle Vill. Apartments v. Plummer, 775 N.W.2d 714, 722 (Iowa 2009) (quoting F.K. v. Iowa Dist. Ct., 630 N.W.2d 801, 805 (Iowa 2001)). As explained below, application of the doctrine of constitutional avoidance requires us to find the challenged provisions of section 622.10 facially constitutional.
B. Reasonable Probability That the Privileged Records Sought May Likely Contain Exculpatory Information. The first issue is the facial constitutionality of the showing necessary before production of mental health records is required under the new statute — namely, that the requesting party show “a reasonable probability that the privileged records sought may likely contain exculpatory information.” Iowa Code § 622.10(4)(a. )(2)(b); see also id. § 622.10(4)(a )(2)(a).
At the outset, it is critical to distinguish between the appropriate test for production and the appropriate test for disclosure of the records. See, e.g., Bishop, 617 N.E.2d at 996-98; Goldsmith v. State, 337 Md. 112, 651 A.2d 866, 877 (1995); Stanaway, 521 N.W.2d at 575; State v. Green, 253 Wis.2d 356, 646 N.W.2d 298, 309 (2002). The test for production performs a threshold function that opens the door to simply examining the records to see if they in fact contain evidence relevant and material to the defense. The test for disclosure is applied only after the records have been examined and found to contain material and relevant evidence. Any factual or legal questions surrounding the issue of whether documents provided for in camera inspection must be disclosed to the defendant are not now before the court and are not addressed or determined in this case. We deal here with only the threshold test pertaining to the production of documents.
With respect to the threshold function, there appears to be a broad consensus that the mere existence of mental health records is not enough to impose a constitutional requirement that they be produced in any criminal case. See, e.g., D.P. v. State, 850 So.2d 370, 374 (Ala.Crim.App.2002) (holding that “when a defendant sufficiently alleges that privileged documents may contain evidence relevant and material to an issue in the case, the trial court should inspect the documents in camera before ruling on the defendant’s motion”); People v. Dist. Ct., 719 P.2d 722, 726 (Colo.1986) (“The vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim’s anticipated trial testimony does not provide a sufficient basis to justify *225 ignoring the victim’s right to rely upon her statutory privilege.”); People v. Foggy, 121 Ill.2d 337, 118 Ill.Dec. 18, 521 N.E.2d 86, 91-92 (1988) (rejecting a defendant’s general request for an in camera inspection of counseling records because the request did not indicate the records “would provide a source of impeachment”); Bishop, 617 N.E.2d at 994-95 (noting a defendant may not have access to a victim’s privileged records in all circumstances). These cases are grounded in the notion that privacy interests — even to the minimal extent invaded by in camera inspection by a judge — should not be sacrificed unnecessarily on overly speculative showings.[8] Yet, because a defendant’s liberty interests are at stake in a criminal trial, the standard for production cannot be too high. As noted in Bishop, “when relevant evidence is excluded ... for some purpose other than enhancing the truth-seeking function, the danger of convicting an innocent defendant increases.” 617 N.E.2d at 994.
Further, as noted in Ritchie, it is impossible to say with assurance that medical records will contain relevant information when no side has seen the records. 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57. To require a defendant to describe with particularity the relevance of information in documents he has never seen is something of a catch-22.[9] State v. Bassine, 188 Or.App. 228, 71 P.3d 72, 76 n. 9 (2003); accord Foggy, 118 Ill.Dec. 18, 521 N.E.2d at 96 (Simon, J., dissenting) (describing a requirement that the defendant demonstrate knowledge of the contents of a mental health record that the defendant does not have as “a perfect Catch-22”); State v. Graham, 142 N.H. 357, 702 A.2d 322, 326 (1997) (noting a requirement that the defendant articulate the “ ‘precise nature’ of the purported contents of the records ... would effectively render review superfluous, as the defendant essentially would have to obtain the information itself in order to meet his burden”); State v. Gagne, 136 N.H. 101, 612 A.2d 899, 901 (1992) (noting trial courts, in determining whether an in camera review is warranted, “cannot realistically expect defendants to articulate the precise nature of the confidential records without having prior access to them”).
The Iowa statute provides that a party must in good faith show a “reasonable probability” that production of the mental health records “may likely” produce exculpatory evidence. Iowa Code § 622.10(4)(a )(2)(b); see also id. § 622.10(4)(a )(2)(a). The phrase “reasonable probability” has been used in a number of other statutes and by a number of other courts in the context of establishing a threshold requirement for the production of mental health records. See, e.g., State v. Pinder, 678 So.2d 410, 417 (Fla.1996) (“To obtain in camera review of confidential communications or records ... a de *226 fendant must first establish a reasonable probability that the privileged matters contain material information necessary to his defense.”); Commonwealth v. Fuller, 423 Mass. 216, 667 N.E.2d 847, 855 (1996) (“A judge should undertake an in camera review of [privileged records] only when a defendant’s motion for production of the records has demonstrated a good faith, specific, and reasonable basis for believing that the records will contain exculpatory evidence which is relevant and material to the issue of the defendant’s guilt.”), abrogated by Dwyer, 859 N.E.2d at 414; see also Stanaway, 521 N.W.2d at 574 (permitting in camera inspection upon “a showing that the defendant has a good-faith belief, grounded on some demonstrable fact, that there is a reasonable probability that the records are likely to contain material information necessary to the defense”). As commentators have explained, terms such as “reasonable probability” in mental health records statutes are extremely elastic and subject to judicial interpretation. See Clifford S. Fishman, Defense Access to a Prosecution Witness’s Psychotherapy or Counseling Records, 86 Or. L.Rev. 1, 40 (2007) [hereinafter Fishman]. As noted by one court, a reasonable probability “lies somewhere between ‘mere possibility’ and ‘more likely than not.’” State v. Blake, 63 P.3d 56, 61 (Utah 2002) (quoting State v. Knight, 734 P.2d 913, 920 (Utah 1987)).
To adequately protect a criminal defendant’s rights to due process and confrontation, the statute must be interpreted in a fashion that provides adequate opportunity for a party to uncover evidence relevant to actual guilt or innocence in a criminal proceeding. Cf. California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984) (noting that due process requires “that criminal defendants be afforded a meaningful opportunity to present a complete defense,” which includes access to exculpatory evidence). As a result, while the term “reasonable probability” in the statute requires a showing more than the mere fact that mental health records of a witness or accuser exist, all that is required is some plausible theory founded in demonstrable fact that suggests the information in the mental health records might well prove helpful to the defense. As noted by the New Hampshire Supreme Court:
The threshold showing necessary to trigger an in camera review is not unduly high. The defendant must meaningfully articulate how the information sought is relevant and material to his defense. To do so, he must present a plausible theory of relevance and materiality sufficient to justify review of the protected documents, but he is not required to prove that his theory is true. At a minimum, a defendant must present some specific concern, based on more than bare conjecture, that, in reasonable probability, will be explained by the information sought.
State v. Hoag, 145 N.H. 47, 749 A.2d 331, 333 (2000) (quoting Graham, 702 A.2d at 325-26). Other state courts agree with this approach. See Burns v. State, 968 A.2d 1012, 1025 (Del.2009) (holding “a defendant need only make a ‘plausible showing’ that the records sought are material and relevant”); Green, 646 N.W.2d at 310 (noting the Wisconsin standard for production “is not intended ... to be unduly high for the defendant”). At least one court, however, has concluded that because of the nature of the crime and the importance of potential impeachment, a defendant charged with sexual abuse of a minor is constitutionally entitled to an in camera inspection of records to determine whether the records contain exculpatory information. State v. McGill, 141 N.C.App. 98, 539 S.E.2d 351, 355 (2000).
*227 The plausible theory of relevance standard is consistent with the United States Supreme Court’s approach in United States v. Valenzuela-Bernal, 458 U.S. 858, 871-74, 102 S.Ct. 3440, 3448-49, 73 L.Ed.2d 1193, 1205-07 (1982), where the Court held a defendant could not show the government violated his rights to due process and compulsory process by deporting alien witnesses absent some “plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense.” See also Washington, 388 U.S. at 23, 87 S.Ct. at 1925, 18 L.Ed.2d at 1025 (holding a state cannot arbitrarily prohibit a defendant from exercising his Sixth Amendment right to compulsory process when the evidence is relevant and material to his defense). When in doubt, the district court should tip the balance toward production of mental health records to preserve the criminal defendant’s constitutional rights to due process and confrontation.[10]
To avoid constitutional problems under the United States and Iowa Constitutions, the phrase “reasonable probability” in section 622.10(4)(a )(2) should be construed to require only a plausible showing that exculpatory evidence may likely be uncovered when the records are produced. Based upon the above interpretation, section 622.10(4)(a )(2)’s reasonable probability threshold meets constitutional muster under the Due Process and Confrontation Clauses of the United States and Iowa Constitutions.
C. Information That Is Not Available From Any Other Source. The next issue is the facial constitutional challenge to the provision of the new statute regarding other sources of information. Iowa Code section 622.10(4)(o)(2)(a) indicates production *228 need not occur unless the evidence “is not available from any other source.” Not all evidence, however, is equal. And not all evidence saying the same thing has equal persuasive power. Thus, when we consider whether information is available from “any other source,” particularly in light of the due process concerns present in a criminal defense, we must consider both the content and persuasive power of the evidence. See Stanaway, 521 N.W.2d at 577 n. 44 (rejecting the notion that evidence is unnecessary because it is cumulative and explaining that cumulative evidence contained in counseling files may be quite probative); Utah v. Worthen, 177 P.3d 664, 673 (Utah App.2008) (rejecting the belief that cumulative nature of information in mental health record deprives the record of its independent probative value); State v. Shiffra, 175 Wis.2d 600, 499 N.W.2d 719, 724 (Ct.App.1993) (noting the probability that the quality and probative value of the information in mental health records “may be better than anything that can be gleaned from other sources”), abrogated on other grounds by Green, 646 N.W.2d at 309-10.
In considering content and persuasive power, medical or mental health records occupy a special place in the evidentiary pantheon and are generally superior to the recalled memory of an interested witness for multiple reasons. First, jurors tend to believe that which is written over that which is spoken. Richard H. Underwood, Logic and the Common Law Trial, 18 Am. J. Trial Advoc. 151, 194 (1996) (citing Irving Younger, The Art of Cross-Examination 25 (1976)). Second, the mental health records are contemporaneously generated. See Jencks v. United States, 353 U.S. 657, 667, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103, 1111 (1957) (“Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory.”). Third, the medical records themselves are usually generated by trained observers who are unbiased regarding the issues in litigation. Ark. Blue Cross-Blue Shield, Inc. v. Tompkins, 256 Ark. 370, 507 S.W.2d 509, 512 (1974) (citing expert testimony that “it is traditional in medicine that the medical record is the key to what is happening to the patient and that great stock is placed in that record as truly and clearly reflecting what happens to the patient as to the care being given”). Fourth, medical records frequently contain information unknown to the patient, including detailed diagnoses, comments regarding causation, and observations regarding a patient’s appearance and demeanor, which may be relevant in a given case. See, e.g., Prymer v. Astrue, No. 10 C 50311, 2012 WL 3988331, at *5 (N.D.Ill. Sept. 10, 2012) (unpublished opinion) (noting the record indicates a claimant for supplemental security income benefits and disability insurance benefits was cognitively intact upon examination following a motor vehicle accident); Hambrick v. Astrue, No. 09-CV-689-PJC, 2011 WL 651408, at *1 (N.D.Okla. Feb. 11, 2011) (unpublished opinion) (indicating the patient testified he did not remember sniffing paint, which was an incident noted in his medical records).
Any lawyer with practical experience with medical or mental health issues would recognize that a deposition of a patient or a witness is not the equivalent of a review of that person’s medical or mental health records. The caselaw recognizes this as well. See State v. Peseti, 101 Hawai’i 172, 65 P.3d 119, 129-30 (2003) (noting animosity may undermine a witness’s credibility, and therefore, the exclusion of statements made to a counselor was not harmless error); In re L.J.P., 270 N.J.Super. 429, 637 A.2d 532, 537-38 (Ct.App.Div.1994) *229 (noting a complaining party’s recantation to a state agency’s psychologist was more credible than recantations made to family members, which may have been coerced); Shiffra, 499 N.W.2d at 724 (“It is also quite probable that the quality and probative value of the information in the [mental health treatment] reports may be better than anything that can be gleaned from other sources.”); see also Fishman, 86 Or. L.Rev. at 50 (calling the requirement that comparable evidence be unavailable from other less intrusive sources “entirely appropriate,” but reminding courts to determine whether the “evidence available from less intrusive sources has persuasive power comparable to that in the privileged material”). While it is possible that, in some cases, the specific evidence in a medical record may well provide no additional useful information for the defense, see State v. Middlebrooks, 840 S.W.2d 317, 333 (Tenn.1992) (holding the district court’s refusal to order production of privileged records was harmless because the records “had little relevance to [the witness’s] credibility or the probative value of his testimony”), superseded by statute on other grounds, Tenn.Code § 39-13-204(i)(7) (Supp.1995), as recognized in State v. Stout, No. 02C01-9812-CR-00376, 2000 WL 202226, at *27 (Tenn.Crim.App. Feb. 17, 2000), in many cases the records will not be useless and will offer evidence of a different content or persuasive quality.
Importantly, however, to the extent evidence might be available to some degree from another source, the decision of whether the other source is comparable to the medical or mental health record simply cannot be made with confidence until the record has been produced and a comparison made between the quality and persuasive power of the record and the other source. With any other approach, the trial court would be conducting a blind and irrational comparison. To use an algebra analogy, one cannot state that X equals Y without knowing something about both X and Y. As stated in the context of executive privilege but applicable here as well: “[A] trial judge cannot accurately evaluate the litigant’s showing of necessity without knowing something of the content of the information sought. There is no judicial algebra by which a court can determine how badly a litigant needs ‘X.’ ” Paul Hardin, III, Executive Privilege in the Federal Courts, 71 Yale L.J. 879, 893-94 (1962) (footnote omitted); accord Stanaway, 521 N.W.2d at 588 (Boyle, J., concurring). Thus, whether information is not available from any other source cannot ordinarily be determined without production of the mental health records themselves. As a result, all that may be required at the threshold stage is a plausible reason to believe the information — considering its quality and persuasive power — is not available from other sources.
Based on the above analysis and resulting interpretation, I conclude the “information that is not available from any other source” language in section 622.10(4)fci)(2)(a) is not facially unconstitutional under the Due Process and Confrontation Clauses of the United States and Iowa Constitutions.
D. In Camera Inspection.
1. Introduction. The next, and most difficult, issue is the facial constitutionality of the in camera inspection of documents that meet the threshold requirements under the statute. See Iowa Code § 622.10(4)(a )(2)(b). At first blush, it may seem that in camera inspection by the district court is entirely adequate to satisfy the demands of the due process and confrontation provisions. District court judges are conscientious, they know the law, and they can be expected to apply the law in a dispassionate manner. We trust *230 our judges. We leave the messy fact-bound issues to the sound discretion of the district court. End of story, next case.
But if one looks under the hood of in camera inspection, one finds potential difficulties. The difficulties arise from the lack of focus on the issues the district court is required to consider, the limited perspective of the district court in considering the relevance of records, the substantial practical problems associated with the in camera inspection and evaluation of mental health records, and the difficulty of preserving meaningful appellate review of district court decisions.
One thing is for sure, however — an uninformed in camera inspection of mental health records will not comport with due process. In other words, the district court must, in some fashion, have at its disposal the tools necessary to conduct a meaningful review and its review must be thorough. Due process does not tolerate shortcuts or guesswork in the production of evidence that may have a bearing on the guilt or innocence of the accused. Further, if in camera inspection is to pass constitutional muster, it will be more time-consuming and, as explained below, will likely to result in more continuances, mistrials, and even reversible error than would result from direct production of records to the parties under court supervision.
2. Challenges posed by in camera inspection.
a. Conflicting roles. In camera inspection requires that the district court assume uncomfortable roles. First, the court must view the mental health records from the perspective of the defense (who has not seen them) to determine if they contain potentially exculpatory evidence. This may be difficult to do. The judge is not simply evaluating arguments, but is also required to anticipate arguments that might be made by defense counsel. As noted by the Supreme Court in Dennis, “[i]n our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate.” 384 U.S. at 875, 86 S.Ct. at 1851, 16 L.Ed.2d at 986; see also Zaal v. State, 326 Md. 54, 602 A.2d 1247, 1263 (1992) (citing the value of review by counsel with an advocate’s eye).
Second, with the records in hand, the district court now, in addition to being placed in the position of an advocate, simultaneously becomes an arm of the state. The obligation of the state to disclose exculpatory material, of course, does not depend on the presence of a specific request by the defendant. Kyles v. Whitley, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995); see also United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (opinion of Blackmun, J.); id. at 685, 105 S.Ct. at 3385, 87 L.Ed.2d at 496 (White, J., concurring in part and concurring in judgment); accord State v. Anderson, 410 N.W.2d 231, 234 (Iowa 1987). Thus, it is possible that the court is under an obligation to review the file and disclose any exculpatory information even if not requested by the defense. See Ritchie, 480 U.S. at 58 n. 15, 107 S.Ct. at 1002 n. 15, 94 L.Ed.2d at 58 n. 15.[11]
*231 b. Limited information base and lack of focus. A district court conducting in camera inspection will necessarily have a limited information base in considering evi-dentiary matters without briefs from the parties to focus its attention. With respect to evidentiary questions, the law generally gives great emphasis to particularity and focus. The failure to make the right objection, for instance, leads to waiver. We are usually pretty persnickety about this. Evidentiary issues are generally tightly focused on particular pieces of evidence a party seeks to offer.
In cases under section 622.10(4), however, the defense will not know what is in the records. As a result, sharply focused briefing will be impossible. See, e.g., Gagne, 612 A.2d at 901. Further, the district court will not have access to the defense’s investigative file and may not be privy to potential strategies available that might be affected by or contingent upon information uncovered in mental health records. As noted in Dwyer,
Despite their best intentions and dedication, trial judges examining records before a trial lack complete information about the facts of a case or a defense to an indictment, and are all too often unable to recognize the significance, or insignificance, of a particular document to a defense.
859 N.E.2d at 418.
The lack-of-focus problem is exacerbated by timing issues. The defense will often seek mental health records as part of pretrial efforts. Timely disclosure may be critical to the development of trial strategy. See People v. Hammon, 15 Cal.4th 1117, 65 Cal.Rptr.2d 1, 988 P.2d 986, 994 (1997) (Mosk, J., concurring) (noting a defendant often requires advance preparation for the cross-examination of an adverse witness and that “to defend himself meaningfully, he must usually seek out the truth immediately: He cannot wait until the cause is called to trial”). As indicated above, the defendant must make some kind of showing of need for the records, but because the defendant has not seen the records, the defendant’s motion will lack the concreteness ordinarily associated with other evidentiary issues. In short, the issues will be “uncrystalized.” Bishop, 617 N.E.2d at 995.
As a result, review by the district court of mental health records will necessarily be less concrete and at a greater level of abstraction than if the records were available under an appropriate pretrial protective order for review by defense counsel, who would necessarily be better informed about the factual and legal issues in the case. The lack of concreteness is a problem solely for the defense. As noted by the Supreme Judicial Court of Massachusetts, the lack of concreteness could lead to both overproduction and underproduction of mental health records. Dwyer, 859 N.E.2d at 418.
c. Practical difficulties limiting an informed review — volume and lack of expertise. The district court may also face practical obstacles in conducting the meaningful review required to comport with due process. The mental health records may be quite voluminous. If so, sensible organization of the material is critical for appropriate review. References abound with instructions for lawyers regarding optimal organization. However, the district court, with its limited resources, may not be in a good position to accomplish preliminary organizational tasks. Further, aside from the voluminous nature of the records, the district court must understand the information they contain. As noted by one *232 authority, “the records may not be arranged in a uniform fashion, abbreviations abound, handwritten comments are often illegible, and procedures will be listed by diagnostic codes.” See Samuel D. Hodge, Jr., Unraveling the Mystery of Medical Records, 52 Prac. Law. 45, 46 (2006).
People v. McCray, 102 A.D.3d 1000, 958 N.Y.S.2d 511 (App.Div.2013), provides an example of these potential difficulties. In McCray, the trial court had inspected thousands of pages of the victim’s mental health records to determine what should be disclosed to the defense. Id. at 519. Eventually, the trial court selected twenty-eight pages that it found “pertinent to the case” to disclose to the defense. Id. at 518; id. at 523 (McCarthy, J., dissenting). The dissenting opinion indicates that, following a thorough review of the documents in the calm setting of appellate chambers, many more documents arguably should have been disclosed. Id. at 523. A bare majority of the five-member appellate court agreed the dissent had unearthed additional documents “relevant to the victim’s competence to testify,” such as references to the victim’s “short-term memory loss,” but nonetheless found the district court had not “failed in its diligent efforts to cull through thousands of pages of mental health records to balance the victim’s rights against defendant’s rights such as would constitute an abuse of discretion.” Id. at 518-19 (majority opinion). In any event, McCray poignantly illustrates the problems associated with burdensome review of voluminous documents by busy trial courts, often in the midst of trial, and subsequent appellate review.
If the district court is to conduct an informed in camera inspection that comports with due process, the district court must get to the bottom of what is actually in the mental health records. A blind review is no review. The district court may be required to arm itself with a medical dictionary, the latest Diagnostic and Statistical Manual of Mental Disorders (DSM), and pharmacology references in order to understand the import of the records. The district court may be required, for instance, to understand the significance of a diagnosis or the impact of prescription drags on memory, perception, and recall. Even so armed, a district court may not be in a very good position to evaluate mental health records with respect to sophisticated issues such as “suggestibility, undue influence, memory contamination, or source monitoring.” 2 Terence W. Campbell & Demosthenes Lorandos, Cross Examining Experts in the Behavioral Sciences, § 10:67.1, at 174 (Supp. Sept. 2012) [hereinafter Campbell & Lorandos].
Thus, another practical problem that arises is the district court’s lack of expertise in reviewing mental health records. According to a leading treatise, “the judge likely does not have any degree of scientific training and expertise to determine if a psychological record has information that may prove exculpatory to the defendant.” Id. § 10:67.1, at 171. For example, in a Georgia case, a defendant in a child molestation case was required to establish in the trial court that records contained exculpatory information without seeing them. Tidwell v. State, 306 Ga.App. 307, 701 S.E.2d 920, 922 (2010). After in camera inspection, the trial court concluded the records should not be disclosed to the defendant. Id. The appellate court noted that “ ‘[a] defendant who challenges a trial court’s in camera inspection on appeal must show what information was suppressed and how it is materially exculpatory.’” Id. at 923 (quoting Dodd v. State, 293 Ga.App. 816, 668 S.E.2d 311, 315 (2008)). According to the treatise writers, this result is problematic for two reasons, the first of which is that “[t]here is no basis in law or any scientific review of the issue to *233 place any faith in a trial judge’s capacity to understand the science involved in issues joined in a child sex case.” 2 Campbell & Lorandos § 10:67.1, at 171; see also Margaret Bull Kovera & Bradley D. McAuliff, The Effects of Peer Review and Evidence Quality on Judge Evaluations of Psychological Science: Are Judges Effective Gatekeepers?, 85 J. Applied Psychology 574, 583 (2000) (finding the scientific training judges receive may be insufficient to help them recognize flaws in psychological research, such as missing control groups and nonblind experimenters). The second reason, according to the treatise authors, is the aforementioned catch-22: “If the defendant has not seen the records, how would they know what information is in them and how it was materially exculpatory?” 2 Campbell & Lorandos § 10:67.1, at 171. Thus, under the Georgia approach, and by implication the approach of other jurisdictions, a defendant seeking mental health records “cannot win for losing.” Id.
Once the medical information has been sensibly arranged, translated, and generally understood, the next practical concern that arises is careful judicial review. A competent attorney representing an accused would see to it that the mental health records are examined line by line to determine whether the records contain (1) direct evidence related to the crime in question; (2) other evidence related to actual or potential factual issues in the case; and (3) evidence useful for impeachment, including inconsistent statements by a witness or evidence related to the ability of the witness to accurately perceive, comprehend, or recall events. In a voluminous file, the attorney involved would make many judgment calls about the value of the information presented and its potential admissibility. Further, if there is doubt concerning the meaning of a record, counsel may retain the services of experts, such as doctors or nurses, to provide the needed explanations.
In all likelihood, the district court may not be as well situated to examine voluminous mental health records. A district court judge will, no doubt, examine the records line by line, and make a conscientious effort to determine if there is relevant and material evidence, but because of the court’s necessarily restricted information base and its lack of experience in comprehensive review of medical records, the review will likely take more time and may be less precise than if conducted by counsel. To the extent the meaning of the records cannot be fully plumbed without outside logistical or expert assistance, the district court could be at a disadvantage compared to an attorney with access to such additional help. And, of course, the examination by the district court will almost certainly be more time-consuming than review by an informed advocate with a clearer eye for germane evidence.
3. Avoiding constitutional problems with an in camera inspection. Our desire to avoid the real and substantial problems in camera inspection poses led to our approach in Cashen. There are several interpretive and procedural approaches available, however, that might be employed to address the potential difficulties.
a. Anticipatory briefing by the parties. To a certain extent, the parties may mitigate the problems of in camera inspection by presenting meaningful briefing that anticipates the difficulties the district court is likely to face. For example, the district court’s lack of medical expertise may be remedied by attaching appropriate materials, such as an expert’s affidavit indicating the potential relevance of possible discoveries in the medical records, pages from the DSM, or other source material likely to be helpful to the district court. The parties, however, will still be unable to *234 fully assist the court because of the lack of knowledge regarding the actual contents of the records. Any anticipatory submissions will necessarily still retain a cart-before-the-horse flavor, but well-prepared counsel should be able, at least to some extent, to anticipate the tools the district court might need for effective in camera inspection.
b.Request for supplemental submissions. The district court should never engage in uninformed review of mental health records. The problem, of course, is one of knowing what one does not know. Production of documents for review by the district court, however, is only an intermediate step. If the district court is unable to determine whether the mental health records contain information that may be germane to the case because of the court’s lack of expertise, it may seek the supplemental assistance of the parties. Requests for assistance could be shaped to avoid disclosure of confidential records where possible, but if an informed review by the district court is not possible without some disclosure, disclosure is necessary to ensure the existence of an informed review. The court can continue to safeguard confidentiality by entering appropriate protective orders. Disclosure to a defense expert under an appropriate protective order, therefore, may be an option to assist the district court in its review.
The notion that in camera inspection may be complemented by other judicially supervised processes is not a stranger to our law. In State v. Heemstra, 721 N.W.2d 549, 563 (Iowa 2006), we held that mental health records should be produced for in camera inspection, but that copies should also be made available to counsel under appropriate protective orders to assist the district court in evaluating the contents of the records. Similarly, in Zaal, 602 A.2d at 1264, the Maryland Court of Appeals noted that a district court could inspect the documents alone or in the presence of counsel. The bottom line is that if the district court finds itself unable to meaningfully review the mental health records in the context of a particular request, there may be an avenue to obtain the assistance of the parties and protect the constitutional rights of the defendant.
c. Reasonable interpretation of requests for production. Because the defense has not had an opportunity to review the requested records prior to the motion for production, district courts should not narrowly interpret such motions. The traditional skeptical judicial eye to evidentia-ry issues should be replaced by the district court’s commonsense understanding of the problems faced by defense counsel seeking production of documents it has not had an opportunity to see. The district court must understand that under the circumstances, the advocacy will be more general, and less precise, than is ordinarily the case. In cases involving close calls, the district court should tilt to the side of ordering production for in camera inspection. Green, 646 N.W.2d at 310.
d. Recognition of obligation to revisit preliminary orders. Any order on a pretrial motion for production or disclosure must be considered preliminary, subject to later review by the court at the request of the defense. This is the teaching of Ritchie. See 480 U.S. at 59-61, 107 S.Ct. at 1002-03, 94 L.Ed.2d at 58-60. Once the evidence has been admitted at trial, the district court will be in a better position than it was pretrial to determine the relevancy of any information in mental health records. If the court determines in light of the evidence that disclosure of information in the mental health records is required, the court can order disclosure at that time.
*235 While rulings after evidence has come in will be better informed, and therefore more accurate, they will necessarily be less timely for the defense. That is the downside inherent in an in camera inspection regime. Once disclosure is made after the receipt of evidence, the defense is entitled to a reasonable period to consider the impact of the evidence and readjust its strategy. Effective cross-examination, however, is not ordinarily developed on the fly. See State v. Clark, 814 N.W.2d 551, 568 (Iowa 2012) (Appel, J., dissenting); see also Hammon, 65 Cal.Rptr.2d 1, 938 P.2d at 994 (Mosk, J., concurring); William F. Conour, Use of Statements in Medical Records in Examining a Witness, 52 Res Gestae 41, 42 (2009) (“Before trial, medical records need to be thoroughly and carefully reviewed by counsel in light of all the anticipated evidence and testimony to determine the possible need for a motion in limine and to outline potential objections at trial.” (Emphasis added.)). As noted by one authority, development of effective cross-examination is not an isolated event but must be integrated with the fabric of the trial through “careful preparation and painstaking effort.” John A. Burgess, Persuasive Cross-Examination, 59 Am. Jur. Trials 1, § 19 (2013). Great cross-examination is not “ad libbed in the courtroom.” Id. Further, a denial of effective cross-examination is a “ ‘constitutional error of the first magnitude.’” Davis, 415 U.S. at 318, 94 S.Ct. at 1111-12, 39 L.Ed.2d at 355 (quoting Brookhart v. Janis, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314, 316-17 (1966)). Because of the need for adequate preparation, a continuance or mistrial may be required to allow the parties to adjust their legal posture in light of the new information. By revisiting the issue after the evidence has been received, however, the district court may mitigate the problem caused by the lack of information at the pretrial stage and may be in a position to vindicate due process rights if subsequent events show that the defendant has been deprived of important evidence that might help establish factual innocence.
e. Entry of appropriate order providing for meaningful appellate review. In addition, in order to ensure due process, the district court should enter an appropriate order that provides for meaningful appellate review. To do so, the district court should outline the manner in which it reviewed the records, generally outline the factual and legal issues presented in the motion to produce, and provide a sufficient explanation of the court’s decision. Where a defendant claims the denial of production violated due process rights, appellate review will be de novo. See State v. Rainsong, 807 N.W.2d 283, 286 (Iowa 2011); Cashen, 789 N.W.2d at 405.
In addition, if the district court makes a judgment against production of evidence for use at trial, the court may, after ruling, provide sealed copies of the underlying excerpts to counsel for purposes of appeal under appropriate court supervision. See McGill, 539 S.E.2d at 355. In this way, appellate review will be far more meaningful than if the parties and the court were operating on a blind record.
4. Facial constitutionality of in camera inspection. Assuming the adoption of the principles discussed above, I conclude the in camera inspection provision of section 622.10(4)(a )(2)(b) does not violate the Due Process or Confrontation Clauses of the Iowa or Federal Constitutions. It appears a bare majority of the United States Supreme Court in Ritchie approved of the practice. 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58. Further, while there is authority for the proposition that in camera inspection of mental health records in criminal cases is not adequate under constitutional provisions in other states, see, *236 e.g., Commonwealth v. Stockhammer, 409 Mass. 867, 570 N.E.2d 992, 1002-03 (1991); Commonwealth v. Lloyd, 523 Pa. 427, 567 A.2d 1357, 1360 (1989), most have followed the approach in Ritchie, see Fishman, 86 Or. L.Rev. at 29 & n. 113.
Our legislature has chosen to provide patients with what it perceives to be greater protection of their privacy rights through the mechanism of in camera inspection. In order to achieve that goal, the legislature has chosen a procedure that shifts the burden of organizing, understanding, and winnowing mental health records from the parties operating under a protective order to the district court in camera.
If the mitigating approaches are implemented as described in this opinion, I am not prepared to conclude the challenged provisions of section 622.10(4)(a) violate the Due Process or Confrontation Clauses of the Iowa or Federal Constitutions on their face. In some relatively simple cases, in camera inspection may work quite well. For example, in cases merely showing routine treatment not related in time or substance to events related to the criminal trial, the trial court may readily conclude that disclosure should not occur. See, e.g., State v. Howard, 221 Conn. 447, 604 A.2d 1294, 1300 (1992) (upholding a district court’s decision, after inspecting psychiatric records, that nothing in the records remotely related to the witness’s ability to testify or perceive events); see also State v. Jackson, 86 Conn.App. 803, 862 A.2d 880, 889 (Ct.2005) (upholding a trial court’s decision to deny the defendant access to records that did “not contain exculpatory or impeachment evidence or evidence relating [to the victim’s] ability to comprehend, know and correctly relate the truth”). On the other hand, as noted in United States v. Lindstrom, 698 F.2d 1154, 1160 (11th Cir.1983), certain mental disorders “have a high probative value on the issue of credibility” and should ordinarily be disclosed to the parties. See also Commonwealth v. Figueroa, 413 Mass. 193, 595 N.E.2d 779, 785 (1992) (holding that “where one of the charges is indecent assault and battery on a mentally retarded person, the defense counsel must be entitled to review the records concerning the complaining witness’s condition of retardation”). When records show evidence probative of a key witness’s ability “to recall, comprehend, and accurately relate the subject matter of the testimony,” the mental health privilege will ordinarily give way. State v. Barroso, 122 S.W.3d 554, 563 (Ky.2003); see also State v. Gonzales, 121 N.M. 421, 912 P.2d 297, 299, 302-03 (Ct.App.1996) (holding the district court did not abuse its discretion in ordering production of psychotherapy records for in camera inspection where the defendant showed the complaining witness “had a history of blackouts from alcohol” and had allegedly consumed alcohol and cocaine on the night of the alleged offense). Similarly, where the defense demonstrates that a witness has given inconsistent statements regarding events surrounding the crime, mental health records relating to those events are obviously subject to production. See Peseti, 65 P.3d at 129-30.
In more complex cases, however, in camera inspection may not work so well. Determination of whether in camera inspection may be unconstitutional as applied in a given case must await a concrete controversy where the district court declines to provide evidence to the requesting party or where a claim is asserted that the district court engaged in an inadequate or blind review.
5. Application of principles to this case. I agree that Neiderbaeh has met the threshold requirement for in camera inspection. Clearly, he has offered more *237 than a generalized request for records. He has shown that the records may reveal mental health problems that reflect on Jherica’s ability to understand or perceive events at about the time of the crime and raise issues regarding her ability to narrate. See Barroso, 122 S.W.3d at 562-63; Gonzales, 912 P.2d at 302-03. The district court must obtain the documents for in camera inspection.
At this stage of the proceeding, at least, there is no basis for judicial intervention on the ground that a violation of due process as applied has occurred as a result of in camera inspection. Any further challenges must await further proceedings in the district court.
E. Summary. Neiderbach has failed to show the challenged provisions of section 622.10(4)(a )(2) are facially unconstitutional. The new subsection to section 622.10 is different from the Cashen protocol. It will to some extent reduce the number of occasions on which defense counsel obtain access to mental health records. The new subsection also shifts the burden of sifting through evidence to the district court, which may not be in an ideal position to properly evaluate the material. Even though district court judges do the best they can to handle the issues, the shift of the burden may lead to delays, continuances, and even mistrials. There are, however, approaches that district courts may employ to mitigate the difficulties posed by in camera inspection. Hopefully, the substantive results under the new statute will be the same as under the Cashen protocol — namely, that defense counsel will gain the constitutionally-required access to potentially exculpatory evidence contained in mental health records. If this turns out not to be the case, however, there may be occasion to revisit the issues posed in this appeal.[12]
Applying the statute, I conclude that the mental health records sought by Neider-bach in this case should have been produced for in camera inspection.
II. Admission of Photographic and Video Evidence.
A. Positions of the Parties. Neider-bach challenges the admission of a photograph and a video into evidence. The photograph, taken in January 2011, shows E.N. with a tracheal tube and a heat moisture exchanger. The video shows E.N.’s trachea tube being cleaned and suctioned and shows him experiencing several seizures. Neiderbach asserts that the evidence is not relevant to any matter in the case under Iowa Rule of Evidence 5.401. In the alternative, Neiderbach asserts that even if the photos are relevant, their probative value was substantially outweighed by the danger of unfair prejudice under Iowa Rule of Evidence 5.403. He claims the exhibits were presented in a way that “maximized [their] theatrical effect and was clearly intended to arouse the jury’s sense of horror.”
The State responds that the photo and video were relevant to show that E.N. suffered a “serious injury.” The State emphasizes the photo and video were not gruesome and not likely to arouse the jury’s sense of horror. The State analogizes to cases where autopsy photographs *238 are admissible to illustrate and make understandable the testimony of a pathologist. See, e.g., State v. Metz, 636 N.W.2d 94, 99 (Iowa 2001). In any event, the State argues any nonconstitutional error would not entitle Neiderbach to a new trial because, in light of the other evidence of E.N.’s injuries, the admission of the photograph and video did not injuriously affect Neiderbach’s rights or create a miscarriage of justice. See, e.g., State v. Parker, 747 N.W.2d 196, 209-10 (Iowa 2008).
B. Discussion.
1. Relevance under Iowa Rule of Evidence 5.4-01. At the outset, I consider Neiderbach’s challenge to the evidence as having no relevance under Iowa Rule of Evidence 5.401. I reject the argument. Under rule 5.401, evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Iowa R. Evid. 5.401. The standard for relevance is a relatively low bar, and I find the State jumped the hurdle with respect to the photo and video. Clearly, the photo and the video contained evidence that tended to show E.N. suffered serious injuries.
2. “Unfair prejudice” under Iowa Rule of Evidence 5.103. I now consider Neider-bach’s more substantial argument that the evidence should have been excluded under Iowa Rule of Evidence 5.403. This rule provides that the district court may exclude relevant evidence “if its probative value is substantially outweighed by the danger of unfair prejudice.” Iowa R. Evid. 5.403.
In considering the admissibility of evidence under rule 5.403, we must first establish the legal framework. The legal framework was well described in State v. Cromer, 765 N.W.2d 1, 8-10 (Iowa 2009). The first question is whether the evidence offered has probative value on an issue in the case. Id. at 8. If the evidence has probative value, our next inquiry asks whether admission of the evidence may cause unfair prejudice that substantially outweighs its probative value. Id. at 9-10.
On the first question, there is no question that the evidence in the videotape has probative value. Whether E.N. suffered serious injuries as a result of child abuse was an important issue in the litigation. The video demonstrates E.N.’s injuries in a powerful way. It is true that the evidence was to some extent cumulative of expert testimony, but where probative evidence is merely cumulative, the admissibility determination is generally left to the discretion of the district court judge. State v. Maxwell, 222 N.W.2d 432, 435 (Iowa 1974). However, the persuasive power of the video is clear. Thus, the video was not merely cumulative, but offered evidence of serious harm to E.N. in a convincing and persuasive fashion. Notably, the defense declined to stipulate to the issue of whether E.N. suffered a serious injury and, as a result, the prosecution was free to prove its case with the available evidence.
Turning to the second inquiry, in Cromer we stated “ ‘ “unfair prejudice” ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.’” 765 N.W.2d at 9 (quoting Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574, 588 (1997)). We also referred to evidence that presents a danger of unfair prejudice as a piece of “unwanted baggage.” Id. at 9-10. In certain cases, we have upheld a district court’s decision to exclude proffered evidence that contained prejudicial collateral baggage unrelated to the elements of the underlying crime. For instance, we have *239 upheld a district court’s decision to exclude evidence of a decedent’s state of undress from the waist down at the time of an accident in a case involving our state’s dram shop act. Horak v. Argosy Gaming Co., 648 N.W.2d 137, 149 (Iowa 2002). We have also held that a district court should have excluded a police officer’s testimony about a defendant’s prior arrests and violent tendencies when asked why he patted the defendant down for weapons because the need for such evidence “was very weak in light of the primary issues in the case,” “[t]he officer had already testified about two other valid, nonprejudicial reasons ... for conducting the pat-down,” and “evidence of [the defendant’s] violent nature could only serve to inflame the passions of the jury.” State v. Martin, 704 N.W.2d 665, 671-72 (Iowa 2005). In the present case, however, there is no collateral baggage. Rather, the claim is made that the probative evidence was simply too powerful, too emotional-laden, to be admitted under rule 5.403.
We have on occasion held that evidence should be excluded under rule 5.403 where there was not collateral baggage but where the evidence was too confusing or encouraged the jury to make unwarranted assumptions. For example, in State v. Huston, 825 N.W.2d 531, 537-38 (Iowa 2013), we held testimony that the department of human services considered a child-abuse report founded should have been excluded because of the danger of unfair influence on the jury. Similarly, in In re Detention of Stenzel, 827 N.W.2d 690, 705-08 (Iowa 2013), we held testimony from an expert regarding the process by which the state decides which inmates will become subject to sexually violent predator proceedings should have been excluded under rule 5.403.
There is some authority that photographs of a crime that do not carry collateral baggage may be excluded if they are merely cumulative and quite gruesome. See, e.g., State v. Poe, 21 Utah 2d 113, 441 P.2d 512, 514-15 (1968) (holding the trial court abused its discretion in admitting color slides made during the course of an autopsy depicting the deceased’s skull after removal of the brain). But see State v. Wells, 603 P.2d 810, 813 (Utah 1979) (rejecting a defendant’s contention that photographs of a victim’s gunshot wounds should not have been admitted into evidence). Some of our older cases generally seem to reject this approach. See State v. Hickman, 337 N.W.2d 512, 515-16 (Iowa 1983) (noting that “[t]rial courts have discretion in determining whether the value of pictures as evidence outweighs their grisly nature” and that “[d]eath pictures are not ordinarily excluded because they are gruesome ... for murder is by nature a gruesome business.”); accord State v. Seehan, 258 N.W.2d 374, 378 (Iowa 1977); State v. Lass, 228 N.W.2d 758, 771 (Iowa 1975).
In any event, we need not decide whether relevant videos or photographs that do not contain collateral baggage may never be excluded on unfair prejudice grounds solely because of their emotional content. The evidence in this case was powerful, but the power arose from the objective nature of the injuries to the child and was not due to dramatic staging or presentation. The evidence was not gruesome, it was not confusing, and it did not invite unwarranted conclusions. Under the circumstances of this case, I conclude there is not sufficient unfair prejudice to reverse the district court’s decision to allow introduction of the evidence.
III. Issues Related to Expert Testimony.
A. Positions of the Parties. Neider-bach challenges the admission of testimony *240 by two prosecution experts regarding evidence contained in articles published in medical journals. The first expert, Dr. Wilbur Smith, offered testimony about an article recounting the story of a nanny who worked for a physician and admitted to having shaken a baby, thereby producing injuries. The second expert, Dr. Carole Jenny, offered testimony about a study in the journal Pediatrics in which twenty-eight persons admitted to shaking babies who were subsequently found to have serious brain injuries.
Neiderbach claims the evidence should have been excluded as hearsay. Neider-bach claims the State did not show the hearsay was within the scope of Iowa Rule of Evidence 5.703, which allows an expert to rely on facts or data if “of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.” Neiderbach points to State v. Barrett, 445 N.W.2d 749, 752 (Iowa 1989), in which we stated, “The usual facts or data, under the rule, would ordinarily be lab or other test results, charts, texts, etc.” Neiderbach asserts that the State failed to meet the foundational requirement of rule 5.703. Even if the State met this requirement, Neider-bach argues, under C.S.I. Chemical Sales, Inc. v. Mapco Gas Products, Inc., 557 N.W.2d 528, 531 (Iowa Ct.App.1996), the evidence should then “only [be] admitted to explain the basis for the expert opinion,” not for its truth.
Neiderbach also contends the admission of the testimony violated the Confrontation Clauses of the State and Federal Constitutions. Neiderbach cites Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 1365, 158 L.Ed.2d 177, 194 (2004), for the proposition that the Confrontation Clause of the Federal Constitution bars “admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” Neiderbach notes the Pediatrics article cited by Dr. Jenny states with respect to the twenty-eight persons who admitted shaking their babies, “ ‘No statement was obtained during hospitalization. All confessions came during police custody or judicial investigation, weeks or months after the diagnosis.’ ” Appellant’s Br. 35 (quoting Catherine' Adamsbaum et al., Abusive Head Trauma: Judicial Admissions Highlight Violent and Repetitive Shaking, 126 Pediatrics 546, 549 (2010)). According to Neiderbach, “ ‘[w]here an expert acts merely as a well-credentialed conduit for testimonial hearsay,’ such testimony violates a defendant’s right to confrontation.” Id. at 36 (quoting United States v. Ramos-Gonzáles, 664 F.3d 1, 5 (1st Cir.2011)).
The State, citing Iowa Rule of Evidence 5.703, maintains the experts may rely upon otherwise inadmissible facts or data in arriving at their opinions if such facts or data are derived from sources “reasonably relied upon by experts in the particular field.” See also Brunner v. Brown, 480 N.W.2d 33, 34-37 (Iowa 1992) (examining rule 5.703). The State maintains that Drs. Smith and Jenny simply relied upon information that was contained in studies published in prestigious medical journals and widely accepted by other physicians. Further, the State argues the evidence may be admitted not for its truth but only to show the basis of the experts’ opinions. See Gacke v. Pork Xtra, L.L.C., 684 N.W.2d 168, 183 (Iowa 2004) (“[E]vidence admitted under [rule 5.703] is admitted for the limited purpose of showing the basis for the expert witnesses’ opinions; it is not admissible as substantive evidence of the matters asserted therein.”). Because the facts and data were not offered for their truth, the State claims, the testimony is not hearsay under Iowa Rule of Evidence 5.801 (c). *241 With respect to such evidence, according to the State the defendant is entitled to a limiting instruction (which Neiderbach did not request) but not exclusion. See Brunner, 480 N.W.2d at 37.
With respect to the Confrontation Clause claim, the State contends the challenged out-of-court statements were not offered for their truth and are not hearsay. See Crawford, 541 U.S. at 59 n. 10, 124 S.Ct. at 1369 n. 10, 158 L.Ed.2d at 197-98 n. 10 (“The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.”). The State cites a leading Iowa treatise, which indicates
[a] significant number of courts have concluded that expert opinion testimony based on testimonial hearsay does not violate the Confrontation Clause because the expert is available and subject to cross-examination and because the otherwise inadmissible data is offered, not for its truth, but to assist in evaluating the testifying expert’s opinion.
7 Laurie Kratky Doré, Iowa Practice Series: Evidence, § 5.703:4, at 715 (2012).
B. The Hearsay Rule and its Exceptions.
1. Iowa Rule of Evidence 5.708. Rule 5.703 allows hearsay testimony “[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.” Iowa R. Evid. 5.703. We have emphasized rule 5.703 is “intended to give experts appropriate latitude to conduct their work, not to enable parties to shoehorn otherwise inadmissible evidence into the case.” Stenzel, 827 N.W.2d at 704. We have held that in order to invoke rule 5.703, the record must show that experts “in ‘the particular field’ ” generally rely on the data in forming their opinions. Id. at 706 (quoting Iowa R. Evid. 5.703). It is thus not enough that an individual expert purports to rely upon the data. Id. Further, the reliance upon the data must be reasonable. An expert’s determination that his reliance is reasonable is not conclusive, but rather is “ ‘only one factor in the consideration.’” Id. at 706 (quoting Brunner, 480 N.W.2d at 35).
2. Iowa Rule of Evidence 5.803(18). Iowa Rule of Evidence 5.803(18) allows admission of facts in a learned treatise “[t]o the extent ... relied upon by [an expert] witness in direct examination, statements contained in published ... periodicals ... established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.” The State, however, does not specifically urge the application of this exception on appeal.
There is a body of federal authority under a parallel rule of evidence related to learned treatises. One of the issues in the federal eases is whether testimony about the nature of the periodical generally is sufficient to allow an expert to introduce hearsay under the learned treatise exception. A leading case in this regard is Meschino v. North American Drager, Inc., 841 F.2d 429, 434 (1st Cir.1988), which stated:
In these days of quantified research, and pressure to publish, an article does not reach the dignity of a “reliable authority” merely because some editor, even a most reputable one, sees fit to circulate it. Physicians engaged in research may write dozens of papers during a lifetime. Mere publication cannot make them automatically reliable authority. The price of escape from cross-examination is a higher standard than “qualified,” set for live witnesses who do not. The words have a serious meaning, such as recognition of the authoritive stature of the *242 writer, or affirmative acceptance of the article itself in the profession.
See also Twin City Fire Ins. Co. v. Country Mut. Ins. Co., 23 F.3d 1175, 1184 (7th Cir.1994) (“It is not enough that the journal in which it appeared was reputable; the author of the particular article had to be shown to be an authority before the article could be used consistently with Fed. R.Evid. 803(18).”); Jacober ex rel. Jacober v. St. Peter’s Med. Ctr., 128 N.J. 475, 608 A.2d 304, 313 (1992) (“Mere publication does not automatically render a text a reliable authority. However, an expert can demonstrate a text’s authoritativeness by testifying that professionals in the field regard the text as trustworthy.” (Citation omitted.)). But see Costantino v. Herzog, 203 F.3d 164, 172 (2d Cir.2000) (“[G]ood sense would seem to compel recognizing some periodicals — provided there is a basis for doing so — as sufficiently esteemed to justify a presumption in favor of admitting the articles accepted for publication therein”).
The approach of Meschino has been endorsed by commentators. For instance, the authors of The New Wigmore: A Treatise on Evidence: Expert Evidence note that “[t]he fact that an article was published after editorial peer review in a respected scientific or medical journal is not sufficient to qualify the article as reliable authority.” David H. Kaye, David E. Bernstein, & Jennifer L. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence § 5.4.2, at 232 (2d ed.2010) [hereinafter The New Wigmore]. Thus, according to the treatise authors, “the ultimate test of whether the article is a reliable authority is not the respectability of the journal, but the authoritativeness of the particular article.” Id. at § 5.4.2, at 233. As an example of the application of this rule, the treatise cites Wiggins v. State, 39 Ala.App. 433, 104 So.2d 560, 566 (1958), where an Alabama court ruled that an article from the Southern Medical Association Journal was properly excluded because the proponent offered no evidence that the writing presented “a substantially recognized theory such as might be found in a standard medical book.” See also The New Wigmore § 5.4.2, at 233; Jack P. Lipton, Maureen O’Connor, & Bruce D. Sales, Rethinking the Admissibility of Medical Treatises as Evidence, 11 Am. J.L. & Med. 209, 226 (1991) (noting recent studies indicate the assumption that a medical treatise is trustworthy “may be unjustified”).
While there are no Iowa cases on point, federal caselaw suggests that magic words are not required to establish the foundational requirements of the learned treatise exception to the hearsay rule. Burgess v. Premier Corp., 727 F.2d 826, 834 (9th Cir.1984) (holding the undisputed facts that the author of a treatise was “the preeminent industry expert” and that a company “required its salesmen to read the books and to recommend them to investors” was sufficient to “substantiate the idea that the books were accepted authority”); Dawson v. Chrysler Corp., 630 F.2d 950, 961 (3rd Cir.1980) (concluding quotations from two reports on automobile crashworthiness prepared for the United States Department of Transportation were admissible under the learned treatise exception where one of the opponent’s experts inferentially conceded its authoritativeness and the opponent did not object at the time of trial).
3. Application of rules to the testimony of Dr. Smith. The State’s expert, Dr. Smith, sought to testify about hearsay statements made by a nanny who apparently admitted to having violently shaken babies who were subsequently found to have injuries. Neiderbach objected on hearsay grounds to the admission of Dr. Smith’s testimony related to the nanny’s *243 statements. In response, the State elicited testimony from Dr. Smith that the hearsay was contained in a published report in a “good medical journal.” The defense at trial countered that the State had not satisfied the learned treatise exception to the hearsay rule, noting that “we don’t even know the name of the article or the journal in which it was published.” Nonetheless, the court after this record was made overruled the objection.
I conclude the court erred on this record in allowing testimony regarding statements made by the nanny. The State made no effort to establish that the hearsay was considered reliable in forming opinions by experts in the field under Iowa Rule of Evidence 5.703. See Stenzel, 827 N.W.2d at 704. While the State offered some testimony related to the fact that the hearsay was published in “a good medical journal,” this is not sufficient to qualify for admissibility under the learned treatise exception. See Twin City Fire Ins. Co., 23 F.3d at 1183; Meschino, 841 F.2d at 434. Thus, the State failed to show the article itself was authoritative and was relied upon by experts in the field.
The State argues the hearsay was not, in fact, admitted for the truth of the matter asserted, but rather only to show the basis of the expert’s opinion. But even as a basis for the expert’s opinion, the evidence must meet the requirements of rule 5.703. Because the testimony of Dr. Smith as it relates to the nanny did not so qualify, his testimony regarding the nanny should not have been admitted.
4. Application of rules to the testimony of Dr. Jenny. The State also sought to introduce hearsay through Dr. Jenny regarding the Adamsbaum study, in which twenty-eight persons involved in child-abuse cases confessed to having shaken their children. At trial, the State asked Dr. Jenny whether the Adamsbaum study was published “in journals typically relied on in the medical field.” Dr. Jenny responded that the article was published in Pediatrics, the journal of the American Academy of Pediatrics, which Dr. Jenny described as “the most prestigious journal in the field of pediatrics.” The district court then admitted the evidence over Neiderbach’s objection.
The admission of this hearsay was also error. The State did not establish that the facts or data in the article were the kind of material relied upon by experts in the field under rule 5.703. The same is true regarding any admission of the material under rule 5.803(18). Although it may be that Pediatrics generally is a prestigious journal typically relied upon by experts in the field, the State did not establish that the specific article in the journal was of a type upon which experts in the field ordinarily rely.
5. Prejudicial error. As noted in Sten-zel, we only find reversible error when admission of improper evidence affects a party’s substantial rights. 827 N.W.2d at 708. Yet, “‘[t]he admission of hearsay evidence is presumed to be prejudicial error unless the contrary is affirmatively established.’” Id. (quoting Gacke, 684 N.W.2d at 183) (internal quotation marks omitted). I conclude on this record that any error in the court’s initial ruling was not prejudicial.
IV. Conclusion.
For the above reasons, I concur in the result in this case.
WIGGINS and HECHT, JJ„ join this special concurrence.

. The parties address the issues in this case as involving due process under the United States and Iowa Constitutions. There is a question whether documents in the possession of a private party implicate standard due process protections. When mental health records are in the hands of a private party, courts have applied a due-process-type analysis under the Confrontation Clauses of State and Federal Constitutions. See, e.g., Burns v. Delaware, 968 A.2d 1012, 1024-25 (Del.2009); State v. Kelly, 554 A.2d 632, 635-36 (R.I.1989). I regard Neiderbach’s argument that the district court ruling violated his right to effectively cross-examine witnesses as raising a claim under the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 10 of the Iowa Constitution.

. Neiderbach's constitutional challenge is limited to the threshold requirement for production, the role of evidence "available from any other source,” and the in camera review of mental health records under sections 622.10(4)(a )(2)(a) and 622.10(4)(a )(2)(b). This case does not involve a facial or as-applied constitutional challenge to section 622.10(4)(íi )(2)(c), which requires the district court to balance the need for disclosure against the privacy interest if the records contain exculpatory evidence. I express no view on any issue that might arise under section 622.10(4)(a )(2)(c).

. I resist the sporting analogy to "fishing” that many courts cannot resist. The metaphor, like all metaphors, is entertaining but often merely used to state a conclusion rather than to provide any meaningful analysis. In fact, because the mental health records are not available to the defense at the time of the effort to obtain their production, there is always an element of "fishing” in the request. The fish is in the lake, not the boat, even when the most compelling request is made. It might be more accurate to state that fishing with a baitless hook won’t do. In any event, I think it better to leave fishing to the people who fish and for courts to employ legal analy-ses rather than catchy phrases to determine the outcome of a case.

. "Catch-22” is a phrase utilized by novelist Joseph Heller to describe "a problematic situation for which the only solution is denied by a circumstance inherent in the problem or by a rule.” Merriam-Webster's Collegiate Dictionary 194 (11th ed.2003).

. Courts have ordered production in camera under statutes similar to Iowa’s in a wide variety of settings. See, e.g., State v. Gagne, 136 N.H. 101, 612 A.2d 899, 900-02 (1992) (holding the defendant made a plausible showing that he was entitled to privileged records where, among other things, he asserted the records might reveal a victim’s prior inconsistent statements and the extent to which state counselors may have participated in preparing the victims for trial); In re L.J.P., 270 N.J.Super. 429, 637 A.2d 532, 538 (Ct.App.Div.1994) (holding the defendant's showing that records might indicate the victim recanted her allegations was sufficient to require production); People v. McCray, 102 A.D.3d 1000, 958 N.Y.S.2d 511, 518 (App.Div.2013) (holding production was appropriate where the victim had a history of mental illness, had been the victim of sexual abuse on three prior occasions, and had attempted suicide during the three months preceding trial); State v. Shiffra, 175 Wis.2d 600, 499 N.W.2d 719, 724 (Ct.App.1993) (holding production was required where a witness's "psychiatric difficulties might affect both her ability to accurately perceive events and her ability to relate the truth”), abrogated on other grounds by State v. Green, 253 Wis.2d 356, 646 N.W.2d 298, 309-10 (2002) (heightening slightly Shif-fra’s threshold requirement from a showing that records "may be necessary to a determination of guilt or innocence” to a good faith showing of "a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant”); see also State v. Middlebrooks, 840 S.W.2d 317, 333 (Tenn.1992) (holding that the defendant made a plausible case that records from a psychiatric hospital might be relevant in determining the veracity of a witness’s testimony because the records "pertained to the mental instability of a witness that existed within a reasonable time before the testimony was given,” but that the district court's error in denying production was harmless in light of the appellate court’s review of the records), superseded by statute on other grounds, Tenn.Code § 39 — 13— 204(i)(7) (Supp.1995), as recognized in State v. Stout, No. 02C01-9812-CR-00376, 2000 WL 202226, at *27 (Tenn.Crim.App. Feb. 17, 2000). Once again, however, it must be stressed that these cases involve the production of documents for in camera inspection and not disclosure of the documents to the defense.

. Suppose the defendant makes a plausible case that a witness has a mental illness that affects his ability to perceive events and that, as a result, the mental health records must be produced for in camera inspection. Upon inspection, the district court finds nothing in the mental health records related to the ability of the witness to perceive events, but finds powerful admissions tending to show the defendant did not commit the crime. Such admissions are clearly highly exculpatory, but outside the narrow confines of the request of *231 the defendant. What does the judge do at this stage? Ignore the exculpatory evidence?

. Our only recent experience with in camera inspection of mental health records occurred in State v. Heemstra, 721 N.W.2d 549 (Iowa 2006). In Heemstra, the district court originally engaged in in camera review and determined that no mental health records should be produced to the defendant. Id. at 559. On review, we determined the district court should have disclosed the records to the defense under a protective order because the records indicated the victim had an explosive disposition that could have been useful in the defense. Id. at 563.